UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                          )
                                )
WYSONG and MILES COMPANY,       )    CASE NO. 04-10005
                                )
            Debtor.             )
                                )

<u>MEMORANDUM OPINION</u>

This case came before the Court on December 20-22, 2005, pursuant to the objection of Wysong and Miles Company (the "Debtor"), to the $2,000,000 proof of claim filed by Qun Ming Zheng (the "Claimant"), who alleges that the Debtor is liable to him for his personal injuries arising out of his use of a bending roll machine manufactured by the Debtor in 1953. The Debtor's motion for summary judgment was heard at the outset of the hearing.[1] The court took the motion for summary judgment under advisement and proceeded with the trial of the objection to the Claimant's claim. The court will resolve this proceeding as a trial and make findings of fact and conclusions of law pursuant to Rule 7052 of the Federal

---

[1] The motion for summary judgment was filed on the day of the hearing and ordinarily would not have been timely under Rule 7056(c), which requires that a motion for summary judgment be filed at least 10 days before the time fixed for hearing. However, in order to meet the deadline in this case for the liquidation of the Claimant's claim, it was necessary to enter a compressed scheduling order that did not leave ten days between the completion of discovery and the hearing date. The court therefore permitted the filing of the motion for summary judgment on December 20, 2005, took the motion under advisement and allowed the Claimant until December 27, 2005, within which to file a written response in opposition to the motion. Because the court is sustaining the objection to the Claimant's claim pursuant to Rule 7052, the Debtor's motion for summary judgment will be denied as moot.

Rules of Bankruptcy Procedure, and will deny the motion for summary judgment as moot.  Based upon the following findings of fact and conclusions of law, the court has concluded that Debtor's objection to the claim should be sustained and that the claim should be disallowed.

BACKGROUND

On December 8, 2003, the Claimant was injured during the course of his employment at Ultimate Restaurant Equipment in Kearny, New Jersey.  At the time of his injury, the Claimant was operating a bending roll machine to form sheet metal into metal cylinders.  While he was feeding the sheet metal into the bending roll machine, the Claimant's left hand came into contact with the front rollers of the machine and was pulled into the rollers.  As a result, the Claimant sustained a severe crushing and degloving injury to his left hand.  The bending roll machine being operated by the Claimant at the time of his injury was a Model C-48 Bending Roll machine that was manufactured and sold by Wysong & Miles Company, in 1953.

On January 2, 2004, Wysong & Miles Company filed a Chapter 11 bankruptcy petition in this court.  On February 10, 2005, the Claimant filed a proof of claim in this case in the amount of $2,000,000 for damages that the Claimant contends he sustained as a result of his injuries on December 8, 2003.  In his claim, the Claimant asserted that the bending roll machine manufactured by the

- 2 -

Debtor was defectively designed in that it had an unguarded, in-running nip point at the point of operation and that it lacked appropriate warnings or instructions regarding the inherent dangers of the machine.  The Debtor objected to the Claimant's proof of claim, denying the Claimant's allegations and asserting, inter alia, that the bending roll machine was safe, free of unreasonable defects or hazards, and presented no undue risk of injury, that the claim was barred by the statute of limitations and the statute of repose, and that the Claimant's use of the machine was contrary to express and adequate instructions and warnings that were provided by the Debtor prior to the Claimant's injury.

On March 23, 2005, an order was entered in this case confirming the Debtor's amended plan of reorganization dated December 30, 2004 ("the Plan").  The Claimant is the holder of an Uninsured Product Liability Claim and is a member of Class 7 under the Plan.  The treatment for the Class 7 claims is contained in paragraph 4.7 of the Plan which provides that Class 7 claims are deemed unliquidated and receive a distribution only to the extent they become Allowed Claims as provided in paragraph 4.7. Paragraphs 4.7.2 and 4.7.3 of the Plan set forth the procedure required in order for such claims to be liquidated and allowed:

> In the absence of an objection by a claimant, filed with the Bankruptcy Court at or before the Confirmation Hearing, the holder of an Uninsured Product Liability Claim shall be deemed to have consented to the determination of the amount and validity of such claim by

the Bankruptcy Court as part of the claims objection and reconciliation process; or, in the event of a timely objection by a claimant to a final determination of such claim by the Bankruptcy Court, the automatic stay shall be modified at the Confirmation Date so that such claimant may pursue liquidation of its claim in the U.S. District Court for the Middle District of North Carolina.

Uninsured Product Liability Claims which are not Liquidated by December 31, 2005, shall not be deemed an Allowed Claim, and claimants shall be forever barred from asserting such Claim thereafter against the Debtor, its estate, Newco, or any successor entity, and shall receive no distribution under the Plan.

No objection to confirmation was filed by the Claimant prior to the confirmation hearing that was held on March 16, 2005. The Plan was confirmed at the confirmation hearing and the confirmation order thereafter was entered on March 23, 2005.

On June 21, 2005, the Claimant and the Debtor submitted a scheduling memorandum providing for 120 days of discovery, which was approved by the court. Discovery thereafter was extended at the joint request of the parties. However, on December 8, 2005, at the request of the Claimant, the court entered an order which expedited the completion of discovery and set the hearing of the Claimant's claim for December 20, 2005, so that the claim could be heard and determined prior to December 31, 2005.

ANALYSIS

A. Jurisdiction

Although jurisdictional issues were not raised by the parties,

- 4 -

"'federal courts are under an independent obligation to examine their own jurisdiction . . . .'" United States v. Hays, 515 U.S. 737, 742 (1995) (citation omitted). An independent review of the court's jurisdiction in this case is particularly apropos because the parties are asking the court to liquidate a personal injury tort claim. Section 157(b)(2)(B) of title 28 provides that a "core" bankruptcy proceeding does not include the "liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate." 28 U.S.C. § 157(b)(2)(B). Similarly, section 157(b)(5) directs the district court to "order that personal injury tort and wrongful death claims . . . be tried in the district court in which the bankruptcy case is pending . . . ." § 157(b)(5). Although Congress tempered the ability of the bankruptcy court to liquidate personal injury tort claims, nothing in the statutory framework of bankruptcy court jurisdiction prevents a bankruptcy court from liquidating a personal injury tort claim when the parties consent to a final order being entered by the bankruptcy court.

Congress granted the federal district courts original, but not exclusive jurisdiction over all civil proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). The purpose of section 1334 is to centralize all bankruptcy proceedings in a single court. E.g., Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995) ("'Congress intended to grant

comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate' . . . .") (citation omitted).  Although the grant of jurisdiction in section 1334 is to the district courts, the district courts have referred that grant of jurisdiction to the bankruptcy courts.  28 U.S.C. § 157(a). Adjudicating a proof of claim filed against the estate alleging a personal injury theory of recovery is a claim that – at a minimum – is related to a bankruptcy case and falls within the jurisdictional grant of section 1334.  See § 157(b)(2)(B) and (O); Pacor, Inc. v. Higgins, 743 F.2d 984, 988 (3d Cir. 1984) (stating that a claim is related to a bankruptcy case if it "could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.").

When a bankruptcy court is adjudicating a non-core proceeding, it is generally limited to submitting proposed findings of fact and conclusions of law to the district court, and any final order is to be entered by the district court.  28 U.S.C. § 157(c)(1). Notwithstanding that general rule, the parties may consent to the bankruptcy judge entering a final order in a non-core matter. § 157(c)(2).  The parties in this case have consented to the bankruptcy court entering a final order in this non-core proceeding because the parties have tried the case on the merits without ever

- 6 -

raising any jurisdictional objection.

The only ostensible barrier to this court exercising jurisdiction over the personal injury tort claim is the language of section 157(b)(5), which directs that all personal injury tort claims be tried in the district court. E.g., In re G-I Holdings, Inc., 323 B.R. 583, 615 (Bankr. D.N.J. 2005) ("[T]his Court has jurisdiction to determine any claims objections that G-I Holdings may assert during the course of the estimation proceedings. The only question at that time would be whether this Court could enter a final order or propose findings of fact and conclusions of law to the District Court."), appeal dismissed, No. 01-30135, 2005 U.S. Dist. LEXIS 31896 (D.N.J. Dec. 9, 2005).

Congress added the language of section 157(b)(5) as part of the Bankruptcy Amendments and Federal Judgship Act of 1984. The Congressional Record indicates that special treatment of personal injury tort cases was required by the Supreme Court's decision in N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982), and that the 1984 Act should provide "for mandatory recall of such cases to the district courts." 98th Cong. 2d Sess., 130 Cong. Rec. S. 8887 (June 29, 1984). Of course, Marathon, concerned the impermissible delegation of Article III judicial power to Article I courts, a constitutional proscription that was fixed in 1984 by making bankruptcy courts units of the federal district court. In commenting on the 1984 Act, Senator Dole stated: "One

of those areas reserved for attention of the district courts will be personal injury claims, which are exempted from the definition of core proceeding under the bill." <u>Id.</u>   Representative Kastenmeier also commented, stating:

> [P]ersonal injury cases and wrongful death cases may not be heard to final judgment by a bankruptcy judge. These cases are to be transferred to the district court judge. Of course, under the provisions of section 157(c)(2), such proceedings may be handled by a bankruptcy judge as long as that judge does not enter a final judgment. In addition, a bankruptcy judge may hear such cases with the consent of all of the parties. Thus, in those rare cases where the parties insist, a personal injury or wrongful death case may be tried to judgment by a district court judge.

98th Cong. 2d Sess. 130 Cong. Rec. H 7471 (June 29, 1984) (footnote omitted).

Consistent with the mandate in subsections 157(b)(2)(B) and (b)(5) bankruptcy courts have not liquidated personal injury tort claims when a party objects to having the matter tried in the bankruptcy court.   <u>E.g.</u>, <u>Control Ctr. L.L.C. v. Lauer (In re Control Ctr. L.L.C.)</u>, 288 B.R. 269, 279 (M.D. Fla. 2002) (holding that even if the claimant had waived his right to a jury trial on other claims, the bankruptcy court did not have jurisdiction over the claim for defamation when the claimant objected because "a district court is required to order that personal injury tort and wrongful death claims be tried in a district court.").   However, the general rule is that nothing prevents a bankruptcy court from conducting pre-trial proceedings on personal injury tort claims.

E.g., In re UAL Corp., 310 B.R. 373, 383 (Bankr. N.D. Ill. 2004) (holding that section 157(b)(5) did not prevent pre-trial proceedings in a personal injury action from being conducted by the bankruptcy court and that nothing prevented the court from making recommendations to the district court even if it could not enter a final order). Similarly, the directive in section 157(b)(5) does not abrogate the ability of a bankruptcy court to liquidate personal injury tort claims by consent under section 157(c)(2). E.g., In re Dow Corning Corp., 211 B.R. 545, 561 (Bankr. E.D. Mich. 1997) (holding that the bankruptcy court could adjudicate personal injury tort claims as a unit of the district court, so long as the procedural requirements of 28 U.S.C. § 157(c) and (e) are satisfied and stating that "[i]n theory, all parties can waive their rights to a jury trial, and consent to determination by the bankruptcy judge sitting without a jury.").

This court concludes that personal injury tort claims fall within the jurisdictional grant to district courts under 28 U.S.C. § 1334, and that section 157 - which enables the bankruptcy court to exercise the jurisdiction granted to the district court under section 1334 – does not restrict the power of a bankruptcy court to liquidate personal injury tort claims as a non-core matter by the consent of the parties. The court reaches this conclusion for two reasons. First, nothing in section 157(b)(5) prevents the parties from stipulating, pursuant to section 157(c)(2), that a personal

injury tort claim may be finally adjudicated in the bankruptcy
court, which is a unit of the district court.  Second, to the
extent that the statutory framework is ambiguous, the court's
conclusion is consonant with Representative Kastenmeier's remarks.
Therefore, nothing prevents this court from entering a final order
on a personal injury tort claim pursuant to section 157(c)(2) when
the parties consent to jurisdiction in the bankruptcy court.

### B. Preemption

The Debtor argues that the Claimant's state law product
liability claim is  preempted by federal law because the Claimant's
state law claim would require greater safety measures than those
imposed by the Occupational Safety Health Administration ("OSHA").
The Debtor alleges that because it has complied with the applicable
OSHA safety standards, the Claimant's claim is barred as a matter
of law.  The Debtor's argument is not accepted.

Federal preemption of state law claims occurs under one of
three conditions: when Congress expressly provides that all state
law in a particular area is preempted; when a pervasive federal
scheme of regulation exists that does not leave any room for the
enactment of state law ("field preemption"); and when there is an
actual conflict between state and federal law.  English v. General
Elec. Co., 496 U.S. 72, 78-79 (1990).  None of these three
conditions is present in this case; consequently, the Claimant's
state law product liability claim against the Debtor is not

preempted by federal law.

Express preemption is not applicable to this case because Congress has not provided that OSHA is a categorical ban on any state law governing the occupational safety and health of workers. To the contrary, Congress has said that the application of state law is not precluded by OSHA.  E.g.,  29 U.S.C. §§ 653(b)(4) ("Nothing in this Act shall be construed to supersede or . . . affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment."); 667(a) ("Nothing in this Act shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect . . . ."); Geier v. Am. Honda Motor Co., 529 U.S. 861, 868 (2000) ("We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions . . . ."); Gonzalez v. Ideal Tile Importing Co., 877 A.2d 1247, 1250 (N.J. 2005) ("[U]nder OSHA, state tort actions are not expressly preempted.").

Field preemption is not applicable to this case because no pervasive federal regulatory scheme exists governing the safety of bending roll machines.  The Debtor argues that the provision in 29 C.F.R. § 1910.212(a)(3)(ii), which provides that a guarding device

"shall be in conformity with any appropriate standards therefore," when combined with a standard promulgated by the American National Standards Institute known as ANSI B11.12-1996, is a sufficiently pervasive regulatory scheme to preempt any state law on the same subject. The ANSI B11.12 standard, however, was never incorporated by reference by OSHA and it is not a federal standard. See 29 C.F.R. § 1910.6 (incorporating large numbers of ANSI standards by reference but omitting ANSI B11.12-1996). The Debtor points to an OSHA Directive, No. CPL-2-1.35 (March 26, 2002), that lists ANSI B11.12-1996 as a "related" standard for safeguarding bending roll machines, but the ANSI standard is never specifically adopted by OSHA in that document. Under these circumstances, the ANSI B11.12 standard does not amount to a pervasive regulatory scheme which leaves no room for enactment or implementation of state law. See Gonzales, 877 A.2d at 1251 (holding that OSHA regulations did not create field preemption because Congress intended to allow states "to have some role in maintaining safe and healthful working conditions.").

Finally, because ANSI B11.12 has not been incorporated into federal law pursuant to 29 C.F.R. 1910.6 or otherwise, any conflict between ANSI B11.12 and state law would not present an actual conflict between federal law and state law and hence would not give rise to preemption.

C. Choice of Law

The Debtor argues that North Carolina law should be applied in this case.  The machine involved in this case was manufactured by the Debtor in North Carolina and initially sold in 1953.  Under North Carolina law, the Claimant's claim would be prohibited under North Carolina's statute of repose.  N.C. Gen. Stat.1-50(a)(6) ("No action for the recovery of damages for personal injury, death or damage to property based upon or arising out of any alleged defect or any failure in relation to a product shall be brought more than six years after the date of initial purchase for use or consumption.").  The Claimant argues that New Jersey law is applicable and that his product liability claims are timely.  N.J. Stat. § 2A:14-2(a) ("Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within two years next after the cause of any such action shall have accrued . . . ."); Dziewiecki v. Bakula, 853 A.2d 234, 236 (N.J. 2004) ("[M]anufacturers . . . are covered by the statute of limitations applicable to the New Jersey Products Liability Act, that, in relevant part, permits suit up to two years from accrual of the cause of action.").

In Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941), the Supreme Court held that a federal court sitting in diversity must apply the choice of law rules of the state in which

it sits. "[I]n the absence of a compelling federal interest which dictates otherwise, the Klaxon rule should prevail where a federal bankruptcy court seeks to determine the extent of a debtor's property interest." In re Merritt Dredging Co., 839 F.2d 203, 206 (4th Cir.) (holding that a bankruptcy court is to apply the forum state's choice of law principles), cert. denied, 487 U.S. 1236 (1988).

Under North Carolina law, the place of the wrong governs the applicable law in tort actions. Boudreau v. Baughman, 368 S.E.2d 849, 854 (N.C. 1988) ("This Court has consistently adhered to the lex loci rule in tort actions. . . . We see no reason to abandon this well-settled rule at this time. It is an objective and convenient approach which continues to afford certainty, uniformity, and predictability of outcome in choice of law decisions."); Terry v. Pullman Trailmobile, Div. of Pullman, Inc., 376 S.E.2d 47, 49 (N.C. Ct. App. 1989) ("The law of the place where the injury occurs controls tort claims, because an act has legal significance only if the jurisdiction where it occurs recognizes that legal rights and obligations ensue from it.").

Statutes of repose and limitations are considered substantive state law. Boudreau, 368 S.E.2d at 857 ("When commencement of an action within a specified period is a condition precedent to relief, 'the limitation period is considered to be so tied up with the underlying right that for choice of law purposes, the

limitation clause is treated as a 'substantive' rule of law.'") (citation omitted); Terry, 376 S.E.2d at 49 ("We hold that because the substantive law of New York controls plaintiff's negligence and strict liability claims, and the statutes of repose are substantive provisions for purposes of choice of law, the trial court erred in applying North Carolina's statute of repose to these claims.").

Accordingly, because North Carolina's conflicts of law rules state that the place where the injury was sustained governs the rights of the parties, and that statutes of limitations and repose constitute substantive state law, New Jersey – not North Carolina – law is applicable to the Claimant's claim.

### D.  Applicable New Jersey Law

Since the 1987 enactment of the New Jersey Product Liability Act, N.J.S.A. 2A:58C-1 through 7 ("NJPLA"), there is one cause of action for recovery for harm caused by a product.  James Hely, New Jersey Law of Personal Injury, § 21.10 (2005).  The nature of the liability of a manufacturer of a product under the NJPLA is described in N.J. Stat. § 2A-58C-2 as follows:

> A manufacturer or seller of a product shall be liable in
> a product liability action only if the claimant proves by
> a preponderance of the evidence that the product causing
> the harm was not reasonably fit, suitable or safe for its
> intended purpose because it: . . . b. failed to contain
> adequate warnings or instructions, or c. was designed in
> a defective manner.

The grounds on which the Claimant contends the Debtor should be held liable under N.J. Stat. § 2A-56C-2 are that the Debtor

- 15 -

failed to provide adequate warnings regarding its C-48 Bending Roll machine and that the C-48 Bending Roll machine was designed in a defective manner.

### 1. Claim for failure to provide adequate warnings or instructions.

A plaintiff relying on the theory of a manufacturer's failure to provide adequate warnings must show that the manufacturer failed to provide an adequate warning and that the absence of an adequate warning was a proximate cause of plaintiff's injury. <u>Coffman v. Keene Corp.</u>, 628 A.2d 710, 716 (N.J. 1993). The NJPLA, in section 2A:58C-4, defines an "adequate product warning or instruction" as follows:

> [O]ne that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by who the product is intended to be used, or in the case of prescription drugs, taking into account the characteristics of, and the ordinary knowledge common to, the prescribing physician.

The standard under this provision is objective rather than subjective. In fact, the provision provides a double objective standard since the manufacturer is held to the standard of a reasonably prudent person under the circumstances, taking into account the ordinary knowledge common to the class of persons by whom the product is intended to be used. John L. McGoldrick &

Frederick T. Smith, <u>New Jersey Product Liability Law</u> § 3-5 (1994). Having weighed the evidence presented at the hearing in accordance with the statutory standard contained in section 2A:58C-4, the court is satisfied that the evidence was insufficient to show by a preponderance that the Debtor failed to provide adequate warnings or instructions regarding the C-48 Bending Roll machine involved in this matter.

The bending roll machine involved in this matter was sold by the Debtor in 1953. The original purchaser was Fable & Company. The exact nature and extent of the instructions and warnings, if any, that were provided by the Debtor in the original transaction more than fifty years ago were unclear from the evidence. However, in July of 1989, the Debtor provided additional instructions and warnings to the company that owned the C-48 Bending Roll machine at that time, Charles F. Luppold, Inc. The evidence established that in July of 1989, after a telephone contact with the Luppold company, the Debtor sent its "safety package" to Charles F. Luppold, Inc. The safety package included a letter (Debtor's Exhibit 1), an eight-page brochure entitled "Bending Roll Safety" (Claimant's Exhibit 8) and two warning signs (Debtor's Exhibits 2 and 3) which were of a type that could be permanently affixed to the C-48 Bending Roll owned by Luppold.

The Claimant argues that the safety package is inadequate because it was not supplied at the time that the bending roll was

originally sold in 1953.  This argument is not accepted.  It is undisputed that the Luppold company was the owner of the machine in 1989 and that the safety package was supplied to Luppold in July of 1989, which was some fourteen years before the Claimant was injured.  It also is undisputed that the larger warning sign that the Debtor supplied in 1989 was placed on the machine because it was still on the machine when the Claimant was injured.  Under these circumstances, it is immaterial from a causation or liability standpoint that the safety package was supplied in 1989 rather than in 1953.  Moreover, under the NJPLA, a manufacturer of a product "shall not be liable . . . in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product leaves its control, if the manufacturer or seller provides an adequate warning or instruction."  N.J. Stat. § 2A:58C-4.  Hence, rather than the timing of the transmittal by the Debtor, under the circumstances of this case, the focus should be upon the contents of the materials that were supplied by the Debtor in 1989 in determining whether the Debtor provided adequate instructions and warnings.

The letter that accompanied the safety package included the following request: "Please have all concerned read and understand this new material enclosed and have the warning signs attached to the machine as indicated on the instructions on the reverse side of the signs."  The instructions on the rear of the smaller sign were

that the sign should be placed on the front of the bending roll in the center thereof, which was a position in which it would be visible to an operator of the machine.  This sign contains the word "WARNING" in large letters and in smaller letters states: "KEEP HANDS AWAY FROM ROLLS".  The larger of the two signs which is 6" x 9" in size also contains the word "WARNING" in large letters. The larger sign was placed on the front of the C-48 Bending Roll machine.  Below the word  "WARNING" on this sign are the words "TO PREVENT SERIOUS BODILY INJURY" followed by a listing of five separate actions that should never be taken with respect to the bending roll.  Each instruction is preceded by the word "NEVER" in larger letters.  One of the instructions contained in the sign is that an operator should "NEVER place any part of your body or clothing in contact with rolls, or roll adjustment mechanism, or at the point of operation."  The sign also contains an instruction that an operator should "NEVER operate machine without pinch points guarded and without adequate point of operation safeguarding." This sign remained on the C-48 Bending Roll machine at the time of the Claimant's injury.

The safety brochure provided by the Debtor in 1989 also included these same "NEVER" warnings and emphasized the importance of providing the warnings to employees as part of a safety program regarding the use of the bending roll.  The safety brochure also included a section entitled "Safety Recommendations for Bending

Roll Operation" which contained an extensive discussion regarding the need for point of operation safeguarding and the methods of providing such safeguarding.  The brochure: (1) states that safeguarding a bending roll is complicated by the infinite combinations of methods of operations used to produce a variety of parts on the bending roll machine, (2) it identifies various methods of providing safeguarding at the point of operation of the bending roll, and (3) it includes a discussion of fixed guards, point of operation devices such as a light curtain or laser beam, point of operation awareness barriers, and emergency stop devices such as a safety foot treadle or emergency stop cable.  One of the recommendations in the brochure is that owners of the bending roll machine "[c]ontact safety equipment suppliers or Wysong's Customer Service Department for advice on safeguarding the point of operation on your Wysong Bending Roll."  Additionally, the brochure references the safety standard entitled "Roll Forming and Roll Bending Machines - Safety Requirements for Construction, Care and Use" which was issued by the American National Standards Institute in 1983 as ANSI B11.12.  The brochure further recommends that owners and users of the bending roll machine obtain and review the standard and gave the source from which a copy of ANSI B11.12 could be obtained.  The information contained in Debtor's safety brochure also identifies the hazards related to the point of operation of the bending roll and describes an effective strategy to provide

awareness of and control exposure to such hazards.

In conclusion, having weighed the evidence adduced at the hearing, the court is convinced that the warnings and instructions contained in Debtor's 1989 safety package were the kind of warnings and instructions that a reasonably prudent manufacturer in the same or similar circumstances as the Debtor would have provided to people intended to use the product. The court further concludes that the warnings and instructions that were provided by the Debtor in July of 1989 communicated sufficient information concerning the operational hazards of the bending roll machine, and that it contained sufficient information on how to safeguard and use the bending roll machine. In concluding that the warning and instructions in this case were adequate, the court has taken into account the characteristics of the type of employees that could reasonably be expected to use the product and ordinary common knowledge. Further, in concluding that the warnings and instructions were adequate, the court took into account that the bending roll was sold without any guard or safety device other than a treadle stop device and a stop switch. Because the Debtor fully discharged its duty to supply adequate warnings and instructions regarding the C-48 Bending Roll machine involved in the Claimant's accident, the Claimant is not entitled to any recovery under his claim for alleged failure to provide adequate warnings or instructions.

2. Claim for Design Defect.

The Claimant argues that the C-48 Bending Roll machine manufactured by the Debtor in 1953 was designed defectively on the basis that it inadequately guarded workers from injuries caused by an in-running nip point hazard.  The Debtor contends that no alternative design was available in 1953 to guard the in-running nip point of the machine that would allow the machine to maintain its utility. The Debtor also denies that the C-48 Bending Roll machine was designed defectively as a result of not having any of the guards or protective devices relied upon by the Claimant. See, e.g., Seeley v. Cincinnati Shaper Co., Ltd., 606 A.2d 378 (N.J. Super. Ct. App. Div. 1992)(noting that the jury had determined that the manufacturer need not provide a guard on a "universal" machine if no one guard would accommodate all applications).

"A manufacturer . . . of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it . . . was designed in a defective manner." N.J. Stat. § 2A:58C-2.  A manufacturer may be exempt from liability if, inter alia, "[a]t the time the product left the control of the manufacturer, there was not a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended

function of the product . . . ."  § 2A:58C-3(a)(1).  "A plaintiff

who asserts a design defect products liability claim 'must prove

under a risk-utility analysis the existence of an alternative

design that is both practical and feasible.'" Hinojo v. N.J. Mfrs.

Ins. Co., 802 A.2d 551, 560 (N.J. Super. Ct. App. Div.) (citation

omitted), cert. denied, 812 A.2d 1109 (N.J. 2002).  That risk-

utility analysis focuses on seven factors:

> (1) The usefulness and desirability of the product -- its
> utility to the user and to the public as a whole.
> (2) The safety aspects of the product -- the likelihood
> that it will cause injury, and the probable seriousness
> of the injury.
> (3) The availability of a substitute product which would
> meet the same need and not be as unsafe.
> (4) The manufacturer's ability to eliminate the unsafe
> character of the product without impairing its usefulness
> or making it too expensive to maintain its utility.
> (5) The user's ability to avoid danger by the exercise of
> care in the use of the product.
> (6) The user's anticipated awareness of the dangers
> inherent in the product and their avoidability, because
> of general public knowledge of the obvious condition of
> the product, or of the existence of suitable warnings or
> instructions.
> (7) The feasibility, on the part of the manufacturer, of
> spreading the loss by setting the price of the product or
> carrying liability insurance.

Cepeda v. Cumberland Engineering Co., 386 A.2d 816, 826-27 (N.J.

1978), overruled on other grounds, Suter v. San Angelo Foundry &

Mach. Co., 406 A.2d 140 (N.J. 1979).  See also Cavanaugh v. Skil

Corp., 751 A.2d 518, 522 (N.J. 2000) ("Although there are seven

listed factors in the classical statement of the risk-utility

analysis . . . the prevalent view is that, unless one or more of

the other factors might be relevant in a particular case, the issue

upon which most claims will turn is the proof by plaintiff of a 'reasonable alternative design . . . the omission . . . [of which] renders the product not reasonably safe.'") (citation omitted).

The C-48 Bending Roll machine manufactured by the Debtor in 1953 is an "initial pinch" type bending roll machine. It has three, parallel, horizontal, five-inch diameter rolls that are about 52 inches long and which are arranged in a triangular configuration. Two of the rolls are stacked one above the other in the front of the machine. The third roll is located to the rear, and the configuration of the rolls allows the machine to bend metal work pieces, ranging from 3½ inches to 48 inches wide, in curved shapes or cylinders. Work pieces are fed manually to the front rolls – into the in-running nip point – and the work piece will either exit at the rear of the machine, or if a more cylindrical shape is being formed, the work piece will arc back over the rolls to the front of the machine. Operators commonly hand feed work pieces into the machine while in close proximity to the in-running nip point hazard.

The two experts in this case agree that the in-running nip point hazard of a bending roll machine cannot be designed away and agree that safety devices were available in 1953 to help prevent injuries caused by the in-running nip point hazard. The experts disagree, however, on whether the available safety devices would impair the intended function of the machine. The Claimant's safety

engineering expert, Neal A. Growney, is a forensic engineer. Mr. Growney, however, stated that he did not have any previous experience working with bending roll machines; rather, he had related experience with rubber mills that also have an in-running nip point hazard. Mr. Growney stated that the C-48 Bending Roll machine was capable of performing an nearly infinite number of operations and he acknowledged that the safety devices he prescribed would prevent a certain, undetermined, number of operations from being performed. Mr. Growney also admitted that he had never seen a bending roll machine with a guard or any of the other safety devices referred to in his testimony. In its totality, Mr. Growney's testimony regarding the inclusion of guards and/or safety devices was very general and provided no specific details as to what would be required in order to install guards or safety devices.

The Debtor's expert, Richard Stein, is a mechanical engineer and was the former vice president of engineering for the Debtor. Mr. Stein has extensive practical experience with the design and operation of bending roll machines. Mr. Stein explained that the C-48 Bending Roll machine was a "universal" machine, and that if safety devices were installed to help prevent injuries caused by the in-running nip point, the machine would be converted from a "universal" machine to a "special purpose" machine. For example, Mr. Stein identified one of the Debtor's customers that used a

bending roll machine to solely make very large cylinders.  A fixed barrier guard is used on that machine because it does not interfere with the machine's intended function.  On the other hand, when Mr. He – the Claimant's employer – experimented with a fixed barrier guard on the bending roll machine that injured the Claimant, Mr. He discovered that the machine could no longer perform the required number of functions that his industry required.  Based on the relevant experience between the two experts regarding the practicality of using safety devices to guard the in-running nip points of bending roll machines, and the court's evaluation of the credibility and reliability of the two witnesses, the Court gives more weight to the testimony of Mr. Stein.

Mr. Growney testified that four methods are available to safeguard the in-running nip point of a bending roll machine that the Debtor did not employ: shut-off pull cords, presence sensing devices, barrier guards, and body/bite bars.  Mr. Growney also testified that interlocking technology was available in 1953 that would shut off the Bending Roll machine in the event a worker came in contact with one of the in-running nip point safety devices.

Of the four devices, Mr. Growney stated that a shut-off pull cord was not available in 1953; consequently, the Court need not consider its use in determining if a feasible alternative design existed when the C-48 Bending Roll machine left the Debtor's control.  E.g., N.J. Stat. § 2A-58C-3(a)(1) (directing that the

feasible alternative design must be in existence at the time the product left the control of the manufacturer); Cavanaugh, 751 A.2d at 519 ("[T]he plaintiff bears the burden of proving that when the product was manufactured, it did not conform to whatever may have been the feasible technology.").

According to Mr. Growning's expert report, presence sensing devices were known to the machine designing industry as early as 1949.[2] According to Mr. Stein, however, a presence sensing device could not be used on the C-48 Bending Roll machine because the presence sensing device had to be placed a sufficient distance from the machine rollers to allow the rollers to stop moving when the presence sensing device was activated. Mr. Stein testified that the applicable standard was to place the presence sensing device 63 inches from the in-running nip point for every second that the machine rollers move after the presence sensing device was activated.[3] According to Mr. Growney's report, it takes the C-48

_____

[2] The Court assumes, without deciding, that the four sources identified by Mr. Growning, from 1949, 1950, 1950, and 1951, were sufficient to establish that a presence sensing safety device was available in 1953 as an alternative design. See generally Feldman v. Lederle Lab., 479 A.2d 374, 385-89 (N.J. 1984) (discussing when a manufacturer has knowledge of a scientific development).

[3] 29 C.F.R. § 1910.217(c)(3)(iii)(e) ("The safety distance (Ds) from the sensing field to the point of operation shall be greater than the distance determined by the following formula: Ds=63 inches/second X Ts where: Ds=minimum safety distance (inches); 63 inches/second=hand speed constant; and Ts=stopping time of the press measured at approximately 90[degrees] position of crankshaft rotation (seconds).").

Bending Roll machine about 1 second to stop after its safety device – an emergency stop treadle – is activated. Mr. Growney also stated that the operation of a bending roll machine requires the operator to stand in close proximity to the in-running nip point. Accordingly, the machine operator cannot both stand in close proximity to the in-running nip point and stand a sufficient distance way for the presence sensing device to be effective if the machine is to have utility for shaping smaller pieces of metal.

Mr. Growney stated that the use of barrier guards to prevent in-running nip point injuries existed by at least 1915 and that the use of a barrier guard would have prevented the Claimant's injuries. Mr. Growney also stated that barrier guards are used in the rubber industry to guard against in-running nip point hazards. Mr. Stein acknowledged that barrier guard technology was well known to the Debtor in 1953, but he testified that supplying the C-48 Bending Roll machine with a barrier guard was not a feasible alternative because it would have substantially impaired the reasonably anticipated use of the machine. More specifically, Mr. Stein stated that a primary utility of the C-48 Bending Roll machine was its ability to shape metal into cylinders. A barrier guard placed in front of the in-running nip point would substantially limit the type and number of operations that the C-48 Bending Roll machine was capable of performing. Mr. Stein acknowledged that barrier guards were used on rubber mills, which

have a similar in-running nip point hazard, but he stated the dynamics of shaping metal – which is inflexible – is different than the dynamics of shaping rubber. As further evidence that a barrier guard was not a feasible safety device, the Debtor introduced the deposition testimony of Mr. He, the Claimant's employer. Mr. He testified that a barrier guard on the C-48 Bending Roll machine prevented him from shaping most cylinders needed in his industry.

Finally, Mr. Growney stated that a body/bite bar was available in 1953 and that the use of that safety device would have prevented the Claimant's injuries. A "bite guard" consists of two parallel horizontal bars placed in front of the in-running nip point. When touched, the bite guard is interlocked with the machine so that the machine will shut down. The bars are spaced to allow the material to be processed, but not the operator's hands. As Mr. Stein testified, however, the effective operation of the bending roll machine often requires the operator to reach over the top of the machine to retrieve the workpiece once it is bent. If the Debtor had included a body/bite bar in the design of the C-48 Bending Roll machine, it would have impeded the operator's ability to reach over the machine. Moreover, placing a body/bite bar in front of the in-running nip point creates the same problems as a barrier guard because it prevents the use of the machine for shaping cylinders.

Based on this evidence, the Court concludes that the use of a presence sensing device, a barrier guard, or a body/bite bar would

substantially impair the reasonably anticipated or intended function of the C-48 Bending Roll machine. More specifically, using the risk-utility factors adopted in Cepeda, 386 A.2d at 826-27, the court finds that: (1) the C-48 Bending Roll machine is a useful and desirable product that provides utility to manufactures and the public as a whole because if its ability to form flat metal sheets into curved shapes and cylinders; (2) the in-running nip point of the C-48 Bending Roll machine poses a danger, and the mere inattentiveness of an operator in feeding material into the in-running nip point may result in a serious injury; (3) no substitute product was identified by the parties; (4) the Debtor had the ability to eliminate the in-running nip point hazard by altering the machine's design to include a guard, but by doing so, the Debtor would have unduly impaired the utility of the machine; (5) the machine operator had the ability to avoid the danger caused by the in-running nip point hazard by the exercise of care, and in fact, some of the Debtor's customers installed their own safety devices based on the use that the bending roll machine was put in that particular industry; (6) the in-running nip point hazard was obvious to the machine operator, that danger was avoidable by keeping the operator's hands away from the in-running nip point, and as the court explained supra, the Debtor provided adequate warnings concerning the danger of the in-running nip point hazard; and (7) no evidence was presented on the feasibility, on the part

of the Debtor, of spreading the loss caused by the inherently dangerous condition presented by the in-running nip point hazard. Therefore, although alternative designs may have been available at the time the Debtor manufactured the C-48 Bending Roll machine in 1953 that would have prevented the Claimant's injury, the Debtor is exempt from liability pursuant to N.J. Stat. 2A-58C-3(a)(1) because – after weighing all the evidence – those alternative designs could not be incorporated into the design of the product without impairing the reasonably anticipated functions of the product. As a result, the Claimant is not entitled to any recovery based upon his claim for alleged defective design.

In addition to failing to show that an alternative design could be incorporated into the design of the C-48 Bending Roll without impairing the reasonably anticipated functions of the machine, the Claimant's evidence also was insufficient to show that the design of the bending roll was defective as a result of not including point-of-operations safety devices described by the Claimant's expert. The evidence pertaining to whether the design of the bending roll was defective was sharply disputed. According to the Claimant's evidence, the failure of the Debtor to equipment the bending roll machine with either a barrier guard, body/bite bar or other device such as a presence sensing device, rendered the design of the bending roll machine defective. According to the Debtor's evidence, the design of the C-48 Bending Roll machine is

- 31 -

not defective even though it does not include the safety devices described by Mr. Growney.  The bending roll machine was equipped with an emergency stop device consisting of a stop treadle which extended across the entire front of the bending roll machine, and with a stop switch located on the  front of the machine on the left side.  According to the Debtor's evidence, the C-48 Bending Roll machine fully complies with the only national standard applicable to bending roll machines.

The standard relied upon by the Debtor is a national standard adopted by the American National Standards Institute ("ANSI") which has been designated as ANSI B11.12-1996 and is entitled "Roll-Forming and Roll-Bending Machines—Safety Requirements for Construction, Care, and Use".  It is undisputed that ANSI B11.12 is the only national standard for bending roll machines.  As noted at the outset of the ANSI standard, a production system involving a roll-bending machine consists of the roll-bending machine as one component, feeding methods as a second component, and the third component, point-of-operation safeguarding.  ANSI B11.12, p. ii. Because there are three components, ANSI B11.12 concludes that point of operation safeguarding "can be evaluated for effectiveness only after the first two components and operator involvement is known."  ANSI B11.12, p. ii.  Obviously, this would be after the machine was delivered to the user.  The ANSI standard further notes that the safeguarding of production systems in roll-bending

operations "is complicated by the wide variety of operations and operating conditions, the variations in size, speed, thickness, and kind of pieces to be worked; the required accuracy of the finished work; the skill of operators; the length of run; and the method of feeding and part removal." ANSI B11.12, p. 2. Since these factors are known and determined solely by the user of the machine, the requirements of this ANSI standard are grouped according to those that apply to the supplier (i.e., manufacturer, rebuilder, modifier) and those that apply to the user. "Some of these requirements are shared between the supplier and user and are so indicated (e.g., hazard identification, hazard control, safeguarding)." ANSI B11.12, p. v.

Part 4.1 of the standard sets forth the responsibility of the manufacturer of a bending roll machine, while Part 4.2 sets forth the responsibility of the user. Under Part 4.1, the safeguards required of the manufacturer are specified as follows:

> The supplier shall equip each new installation
> of a machine with safeguards of one or more of
> the following types as appropriate:
>  — a point-of-operation guard;
>  — a point-of-operation device;
>  — an emergency stop control plus one or more
>    emergency stop devices.

ANSI B11.12, p. 9.

The evidence established that the Debtor complied with Part 4.1, the portion of Part 4 applicable to the Debtor as the supplier of the C-48 Bending Roll. The requirement is that the supplier

equip each new machine with "one or more" of safeguards described in Part 4.1.  One of the safeguards specified in Part 4.1 is "an emergency stop control plus one or more emergency stop devices." The evidence established by a preponderance that C-48 has an emergency stop control consisting of a stop treadle bar that extends along the entire front of the machine plus a stop button which can be used in emergencies to stop the operation of the bending roll.  Thus, the Debtor complied with Part 4.1.

The types of safety devices described by the Claimant's expert are dealt with in Part 4.2 of ANSI B11.12 which spells out the responsibilities of the user of a bending roll.  Part 4.2 provides that the user "shall be responsible for the overall workplace safety of personnel" and requires that:

> The user shall designate, provide, and ensure the use of at least one of the following methods of point-of-operation safeguarding that affords maximum protection for the operator, consistent with the requirements of the operation:
> — a point-of-operation guard;
> — a point-of-operation device;
> — a point-of-operation awareness barrier shall only be used where the point-of-operation guard or device is not feasible;
> — emergency stop device.
>
> The user shall determine what protective equipment is required and shall train the employee and enforce the use of the equipment.

ANSI B11.12, p. 11.

Part 4.2 makes it clear that under ANSI B11.12 the responsibility for providing the types of point-of-operation guards

and safety devices described by the Claimant's expert is upon the user of the machine and not the supplier.  Requiring that the user have the responsibility for providing and ensuring the use of point-of-operation barriers and safety devices reflects the universal nature of the bending roll machine and the practical reality that it is only after the machine reaches the user that a determination can be made as to the type of work practices that are required and the type of point-of-operation safety device that is feasible.

Under Part 4.1 the supplier shares the responsibility to "identify the sources of hazards" and "eliminate or provide the means for controlling the identified hazards by implementing a hazard control strategy. . . ."   ANSI B11.12, p.8.  Part 4.1 further provides that the "supplier of new equipment shall provide instructional material for installation, testing, startup, care, use, safeguarding, and maintenance."  The safety package that the Debtor supplied in 1989 satisfies all of the foregoing requirements.  As reflected in the earlier discussion of the materials contained in the safety package, the hazard posed by the intake rollers on the C-48 Bending Roll machine was identified in a clear and easy to understand manner.  The warning signs that were attached to the bending roll machine, together with the information and recommendations in the Debtor's safety brochure formulated and transmitted to owners and users of the bending roll strategy for

controlling the hazards identified in the materials and for providing safeguarding for employees.

Under New Jersey law, a manufacturer's compliance with an industry wide or national standard such as ANSI B11.12 is not conclusive on the issue of defective design, but is a factor that may be considered by the trier of fact in assessing a manufacturer's reasonableness in marketing a product with a particular design. See Ryan v. KDI Sylvan Pools, Inc., 579 A.2d 1241, 1243-1248 (N.J. 1990); Cepeda, 386 A.2d at 836. Thus, while Debtor's compliance with ANSI B11.12 is not conclusive on the issue of defective design, such compliance is a factor which supports the Debtor's contention that the C-48 Bending Roll was not defectively designed even though it did not contain the point-of-operation safety devices relied upon by the Claimant.

Having weighed and considered the all of the evidence pertaining to whether the design of the C-48 Bending Roll was defective, including the evidence that Debtor's design of the C-48 Bending Roll machine complies with ANSI B11.12, the court concludes that the evidence relied upon by the Claimant was insufficient to show by a preponderance that the C-48 Bending Roll machine was designed in a defective manner.

### E. Conclusion

Based upon the foregoing findings and conclusions, the court has concluded that the Debtor's objection to the Claimant's claim

should be sustained and that the Claimant's claim should be disallowed.   An order so providing shall be entered contemporaneously with the filing of this memorandum opinion.

PARTIES TO BE SERVED

William P. Miller

John A. Northen

Amiel J. Rossabi

Jason M. Goins

Nicole Hazzard, Esq.
150 East 58th Street
New York, NY 10155