UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                          )
                                )
Wysong & Miles Company,         )      Case No. 04-10005C-11G
                                )
            Debtor.             )
                                )

## MEMORANDUM OPINION

This case came before the court on June 8, 2011 for hearing on
the merits of the Claim of Reedy Fork Investments, LLC.  John A.
Northen and Amos C. Dawson III appeared on behalf of the Debtor,
Wysong & Miles Company ("Debtor" or "Wysong").  John H. Small and
George W. House appeared on behalf of Reedy Fork Investments, LLC
and its predecessor in interest, Pennston Corporation (collectively
"Claimant").  Having received and considered the evidence offered
at the hearing and the arguments presented on behalf of the
parties, the court makes the following findings of fact and
conclusions of law pursuant to Rule 52 of the Federal Rules of
Civil Procedure and Rules 7052 and 9014 of the Federal Rules of
Bankruptcy Procedure.

## NATURE OF HEARING

On June 21, 2006, the court entered an order approving certain
stipulations between the parties concerning Claimant's claims
against the Debtor ("Claims Stipulation Order").  Under these
stipulations, the Debtor did not contest liability to the Claimant,
but left the amount of the claim to be determined by agreement

between the parties, or by the court should no agreement be reached. As the parties were unable to come to an agreement, this hearing was held for the purpose of determining the damages to be included in the Claim.

## JURISDICTION

The court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B) which this court may hear and determine.

## FACTS

1.   Contamination of the Wysong Property

The Debtor's operations have historically concentrated on the manufacture of industrial metal forming machines. The Debtor owns an industrial facility several miles northeast of Greensboro, North Carolina, along the U.S. Highway 29 corridor. The Debtor previously conducted its manufacturing operations at the facility, and continues to occupy the facility even though manufacturing operations are no longer conducted at the facility.

As part of the Debtor's manufacturing operations, the Debtor utilized degreasing equipment, including a 1,500 gallon above-ground storage tank containing 1,1,1-trichloroethane (TCA), a chlorinated solvent. The tank was in use from 1965 until February

of 1989. In October of 1987, the Debtor discovered and subsequently repaired a leak in the underground supply line attached to the TCA tank. Using inventory records, the Debtor's expert consultants estimate that the leak began in May 1987 and involved loss into the environment of approximately 2,500 gallons of TCA over roughly six months of undetected leaking.

After discovering the leak, the Debtor contacted relevant authorities, and Guilford County officials tested existing wells in the area.[1]  The Debtor began clean-up and recovery operations immediately after discovering the TCA tank leak.  An approximate total of 2,035 gallons of TCA was recovered through soil vapor extraction.  Subsequently, the Debtor installed a groundwater recovery well, which recovered an additional 133 gallons of TCA, mostly from July 1990 to 1992.

The remaining TCA either vaporized during the leak, remains in soil on the Debtor's property, or has entered the groundwater below the Debtor's facility.  Further testing has indicated continued presence of some TCA in the soil on the Debtor's property in the area immediately proximate to the former storage tank.  Monitoring

_____

[1] Testing in 1987 revealed contamination in the subdivision to the south of the Debtor's property.  Based on the topography of the area, among other things, Wysong prevailed in litigation that sought to hold it responsible for this contamination.  The end conclusion is there was separate environmental discharge by a third-party somewhere to the south of Wysong's property.  This second discharge and what effects, if any, it might have on Wysong's property is not relevant to the instant dispute between Wysong and Pennston.

wells installed on the Debtor's property and on adjoining property to the northeast show continued presence of TCA in the groundwater, together with related compounds arising from the natural breakdown of the TCA molecules.

Once in groundwater, a solvent such as TCA tends to disperse and migrate. Such migration will be in a down gradient direction, a concept for groundwater roughly analogous to water moving downstream in surface water. Here, the groundwater solvents have migrated in a northeasterly direction, through and off the Debtor's property and into the groundwater beneath the Claimant's property.

Generally, if groundwater wells are not in use, groundwater contamination poses little risk to humans using the land above. However, further sorts of contamination can arise as a complication of contaminated groundwater. For one, there may be groundwater to surface water movement resulting in contaminated surface water. Additionally, the solvent contaminates can volatilize and become soil vapor which can exit the land surface into the atmosphere. Soil vapor can be of concern when structures are built on contaminated land. In such event, a pathway of exposure may occur if a concentration of vapor builds up under the non-porous structure which may then enter the structure if there are cracks or other openings in the floor, with the result being unacceptable indoor air quality.

With respect to the Debtor's solvent contamination, sampling has not detected any solvent levels of concern within surface water, save one sample taken during extreme drought conditions. Such a sample is unrepresentative of the normal environment and in many ways represents a worse-case sample. Soil vapor in excess of screening levels has been detected on the Debtor's property in the area of the former TCA storage tank. However, this soil vapor is most likely a consequence of contaminated soil from the leak itself, not volatilization of groundwater. In a study conducted in September of 2009, no soil vapor concentrations of concern were detected elsewhere on the Debtor's property.

2.   Claimant's Property

The Debtor's property is roughly triangular, bounded on the west by U.S. Highway 29, on the south by an older subdivision, and on the east by undeveloped land across the historical routing of Eckerson Road. The Claimant's property is located immediately to the east of the Debtor's property and is referred to by the parties as the Pennston tract.[2] The Claimant's property consists of a little over 70 acres and is triangular in shape, with creeks

_____

[2]This tract is owned by Claimant Reedy Fork Investments, LLC, who purchased it pursuant to a sales contract assigned from Pennston Corporation. Due to Pennston's early involvement and potential confusion regarding other Reedy Fork entities and properties, the parties have used the term "Pennston tract" as a proper name for that land. For ease of reference and consistency with other matters on record in this case, this opinion continues to use this name.

meandering along the northern and southeastern sides and the Debtor's property situated to the west. The tract was undeveloped in 1987 when the TCA release occurred, and remains essentially undeveloped.

The Pennston tract is owned by Reedy Fork Investments, LLC, one of several related corporate entities participating in a large-scale development known as the Villages at Reedy Fork. The Starmount Company and Hubbard Realty of Winston-Salem, Inc. are the primary companies behind the development. This development includes hundreds of acres on both sides of U.S. Highway 29, with most of the land being to the north and west of the Pennston tract (the "Reedy Fork property"). The conceptual plan for the Reedy Fork property includes a range of uses, including single and multi-family residential, commercial offices and retail, public spaces, and future industrial. To date, development of the Reedy Fork property has been residential, with the exception of an elementary school built in the northern section of the development.

Originally, Eckerson Road was the western boundary of the Pennston tract. As part of the Reedy Fork development, Eckerson Road was relocated to intersect a new Reedy Fork Parkway located within the Pennston tract. As a result, the tract now exists as three parcels: Section A1, a 9.84 acre tract immediately to the east of the Debtor's property; Section A2, a 11.32 acre tract to the east of A1 across the relocated Eckerson Road; and Section A3,

a 53.66 acre tract to the northwest and across Reedy Fork Parkway from the other sections.  The total acreage of these parcels is reduced by the right-of-way dedications for the two roadways, and Section A3 is further reduced by a 21.34 acre dedication along the creeks for flood plain and open space.

As mentioned earlier, contamination consistent with the Debtor's TCA release has been detected in the groundwater below all three parcels of the Pennston tract.  Testing in 1999 first revealed this contamination, and regular testing and monitoring thereafter has provided a more detailed picture of the contamination.  At present, eleven wells exist on the Pennston tract, including six intermediate depth monitoring wells.  Two of these wells, referred to as PWR-7 and PWR-8 were installed in July 2010 north of Reedy Fork Parkway within Section A3, and represent the northernmost monitoring wells.  Sampling at these wells, as with the older monitoring wells, indicates chlorinated solvent concentrations in the groundwater in excess of North Carolina groundwater standards.  Therefore, the entirety of the Pennston tract is considered to be impacted by groundwater contamination.

No source of contamination exists within the Pennston tract, nor has been known to exist in the past.  Geological data suggests, and the parties do not dispute, that the source of the groundwater contamination is the Debtor's property.  Recognizing that the Debtor's property could be a source of contamination, the Debtor

and Pennston in 2000 executed an indemnification agreement, in which the Debtor agreed to indemnify Pennston against damages resulting from the contamination.  This indemnification agreement and the contract to purchase the Pennston tract were assigned to Reedy Fork Investments, LLC and the purchase of the Pennston tract from Reedy Fork Ranch LP to Reedy Fork Investments, LLC subsequently closed.

As there was never a source of contamination on the Pennston tract, no soil contamination is suspected, and none has been detected.  As noted earlier, only once has surface water contamination been detected, during severe drought conditions. This particular surface water sample was collected from the eastern tributary to Reedy Fork Creek at a sampling site north of the Reedy Fork Parkway.  While there is a possibility that more contamination could move into surface water in the future, the possibility that surface water standards will be exceeded is remote.  While the Claimant does not agree with this conclusion by the Debtor's expert, no evidence to the contrary was offered by the Claimant.

Soil vapor testing has been conducted on the Claimant's property.  Testing in September of 2009 included three vapor sampling points located on the property, none of which exhibited compound levels in excess of residential or industrial standards. However, when the PWR-7 and PWR-8 groundwater sampling wells were installed and sampled in July 2010, the groundwater concentrations

of 1,1-Dicholoroethane (1,1-DCE), a product of TCA breakdown, exceeded the state's residential vapor intrusion screening levels. Such a result does not mean that soil vapor is present. Rather, it indicates that based on the state of the groundwater, soil vapor is a possible concern to monitor. The Offsite (Pennston Property) Groundwater Assessment Report prepared in September of 2010 by Hart & Hickman (Debtor's Exhibit 11), the experts employed by the Debtor, compares the groundwater concentrations at PWR-7 and PWR-8 to those at several other groundwater sampling wells each proximate to a soil vapor sampling point. These experts opine that for the particular geology of the Debtor's and Claimant's properties, the soil vapor samples taken near groundwater sampling wells are likely to be representative of the soil vapor concentration to be expected for a given groundwater contaminate concentration level. Their opinion, which is accepted by the court, is that since even sites on the two properties with more concentrated groundwater contamination do not exhibit soil vapor levels of concern, that soil vapor is unlikely to be present on the Claimant's property in the vicinity of PWR-7 or PWR-8 either.

     3.   The Bankruptcy Filing

     The Debtor filed a voluntary petition for relief under chapter 11 of the bankruptcy code on January 4, 2004. The filing was precipitated by product liability litigation pursued by plaintiffs alleging injury during the use of equipment manufactured by the

Debtor.   Proceeding as Debtor-in-possession, the Debtor obtained confirmation of an Amended Plan of Reorganization on March 23, 2005.  As the case moved forward, claims were resolved and payments made, leaving only the Pennston claims and the claim of the North Carolina Department of Environment and Natural Resources (DENR) to be resolved.

Pennston filed two unsecured claims in this case, Claim numbers 71 and 72.  Claim No. 71 asserted liability for cleanup of the groundwater below the Pennston tract and Claim No. 72 was based upon the indemnification agreement with the Debtor. Pennston also filed an application for the allowance of an administrative expense claim related to the cost of the clean-up.  The Debtor's objections to these claims were resolved by the Claims Stipulation Order that was entered in June of 2006.  Under the order, the indemnification claim was settled for the sum of $54,000.00, with the portion of the claim for damages from diminution in value and for brownfields costs and expenses deferred for later resolution, which is the matter now before the court.

4.   The DENR Claim

DENR filed a claim to recover the cost of assessment and remediation of hazardous waste on the Debtor's property.   The Debtor objected to the DENR claim, indicating an intention to modify its plan of reorganization in order to perform the environmental work itself.  Modifications to the plan were approved

by the court on August 17, 2006, including that the Debtor would complete an environmental assessment and propose a corrective action plan to DENR.  The modified plan also established escrow accounts for both the DENR claim and the Pennston claims, to be funded as payments were made to other unsecured creditors.

Acting under the modified plan of reorganization, the Debtor has borne the costs of extensive assessment and analysis of the contamination on and from its property undertaken in recent years. As a result of the Debtor's efforts, an administration agreement with DENR providing for state-directed assessment and remedial action was entered into on July 8, 2010.  This agreement provides for the submission of a Remedial Action Plan ("RAP") to DENR and procedures for managing and monitoring its implementation.  The agreement contemplates that the RAP will evaluate alternatives for remediation, with the RAP to be subject to review and approval by DENR.  A consent order was entered by the court on November 16, 2010, approving a stipulation in which the Debtor agreed that its environmental responsibilities continued without being discharged in this case and DENR agreed to withdraw its claim against the estate.  The order and stipulation also released the DENR escrow account to the Debtor for the purpose of offsetting future costs associated with the administrative agreement.  The effect of such stipulation and order is that the DENR claim is resolved, with the

Debtor subject to the terms of the administrative agreement and with continuing responsibility to implement its RAP.

5. Debtor's Remedial Action Plan

The Debtor elected to split its RAP into two phases. The first phase, for which a detailed plan has been submitted, concerns the groundwater contamination. A second phase will address soil contamination in the area of 1987 leak, which may include soil beneath the Debtor's building. The Debtor proposes to test and delineate the extent of soil contamination within 120 days of approval of phase I, and then submit phase II of the plan within 120 days of receiving the results of those tests.

The Phase I RAP proposes monitored natural attenuation for removal of the groundwater contamination combined with land use restrictions. Use of natural attenuation as a remedy recognizes that natural processes in the environment will gradually break-down the contaminates and that at some point concentration levels will no longer be of concern. The active aspects of the proposed remedy are long-term monitoring and recordation of land use restrictions.

The land use restrictions under the RAP are proposed for both the Claimant's property and the Debtor's own property. The core components of the proposed restrictions include: (1) a restriction against use of groundwater, i.e. no groundwater wells; (2) an annual letter report to DENR that the restrictions remain in effect and activity is in compliance; (3) access to the property for

- 12 -

assessment and remediation; and (4) inclusion of the restrictions and compliance requirements in conveyances and leases. The cooperation of the Claimant is required for the Debtor to implement its proposed RAP because the Claimant must allow access to its property for monitoring and must agree to the land use restriction to be imposed under the RAP. The Claimant's consent to land use restrictions occurred in October of 2010, when the Claimant proceeded with the submission of an application to enter its property into the North Carolina brownfields program which requires land use restrictions in order for contaminated property to be admitted into the program.

6. Entry of Claimant's Property into the
   Brownfields Program

As with many states, North Carolina has established a program to encourage the redevelopment of environmentally contaminated sites. The Brownfields Property Reuse Act of 1997, N.C. Gen. Stat. §§ 130A-310.30 to .40 (2009), provides for the North Carolina Brownfields Program. Under the program, a prospective developer whose property is admitted into the program may enter into an agreement with DENR providing for future use of the property subject to agreed upon remediation and land use restrictions.

To be eligible to obtain a brownfields agreement, a prospective developer must demonstrate several factors to the satisfaction of DENR. Some of these factors concern the developer itself, including a requirement that the developer not have been

responsible for the contamination and have no adverse history involving compliance with prior brownfields agreements, remediation efforts, or environmental laws.  Other factors include the public benefit that will be derived from the proposed development and a showing of technical and financial feasibility for implementation of the agreement.

The primary reward a brownfields agreement offers to an eligible developer is protection from environmental liability.  The developer's remediation responsibility is limited to that specified by the agreement which protects the developer from further clean-up liability.  As long as the terms of the agreement are complied with, the agreement also protects parties to whom the brownfields property may be transferred in the future.  This liability protection operates to reduce uncertainty and promote development since the protection afforded transferees of the brownfields property facilitates the marketing of development property by developers such as the Claimant.  Developers of brownfields property also benefit from a pro-rated five year property tax exclusion on the value of improvements constructed on brownfields property.  See N.C. Gen. Stat. § 105-277.13 (2009).

Land use restrictions are a common component of brownfields agreements.  The exact nature of the land use restrictions will vary from site-to-site and are dependant on the contamination profile of the property.  Broadly speaking, groundwater

contamination is associated with land use restrictions that restrict use of the groundwater for wells, restrict excavation of soil beyond a specified depth, and specify the activities to be conducted on the land.   Additionally, land use restrictions typically provide for access to the land for testing and remediation and require reporting to DENR.

To obtain a brownfields agreement, a prospective developer begins by filing an application with DENR.   Based on the application, DENR will determine if the site is eligible for entry into the brownfields program.   If the property is determined to be eligible for entry into the program, the final step is for the developer and DENR to negotiate the terms of a brownfields agreement.

As reflected in the Claims Stipulation signed by the Claimant in June of 2006, the Claimant determined that entering the brownfields program would best serve its interests in selling the Pennston tract for development.   In October of 2011, the Claimant's attorneys began working on a brownfields application.   The completed application was submitted to DENR on March 9, 2011.

After submission of the brownfields application, Tony Duque of DENR sent to the Claimant a letter dated May 2, 2011 concerning the status of the application and an initial impression of likely land use restrictions.   (Claimant Exhibit 27).   Subsequently, on June 6, 2011, DENR provided a letter of eligibility to the Claimant.

(Claimant Exhibit 31).  This letter of eligibility represents a determination that the Claimant and the Claimant's property meet the legal eligibility requirements to enter the brownfields program.  Prior to this determination, the parties were prepared to litigate the likelihood of eligibility as an aspect of damages within the Claim.  Eligibility having been determined, the uncertainty that remains pertains to the exact land use restrictions that likely will be required in the brownfields agreement and the effect of such restrictions upon the value of the Claimant's property.  These and the other matters bearing upon the damages that should be awarded in this case will be addressed in the discussion that follows.

### DISCUSSION

The first issue that will be addressed is the amount that should be awarded to the Claimant in order to reimburse the Claimant for the reasonable costs and expenses incurred by the Claimant in "seeking, negotiating and implementing the requirements of a Brownfields Agreement for the Pennston Tract, taking into consideration (i) out of pocket expenses incurred by Pennston and payable to its attorneys, environmental consultants, or other professionals in obtaining the Brownfields Agreement, (ii) the internal costs necessary to prepare and submit a development plan to the extent necessary to comply with the requirements of the Brownfields Program application, and (iii) the estimated cost of

implementing the Brownfields Agreement, once approved, reduced to net present value." (Final Pretrial Order, Exhibit C).

A.    Expenses and Professional Fees Recoverable by Claimant

Seeking a Brownfields Agreement (BFA) involves completing an application form supplied by DENR known as a Brownfields Property Application and submitting the form along with the required exhibits to DENR. The Claimant submitted the required application on March 9, 2011. (Claimant Exhibit 25). In submitting the application, the Claimant incurred certain expenses consisting of the fees required by DENR and the fees of the professionals employed by the Claimant to assist with the preparation and filing of the application.

1.    Fees Charged by DENR

The fees required by DENR from a party seeking a BFA include a fee of $2,000.00 when the application is submitted as well as a fee of $3,500.00 when the BFA is later obtained. The Claimant has incurred or will incur both of these fees in obtaining a BFA and therefore is entitled to include the sum of $5,500.00 in its claim as reimbursement for such fees. Professional fees would include surveying or engineering fees, environmental consultant charges, and legal fees.

2.    Engineering Fees

Part III(D) of the Brownfields Property Application requires that the applicant submit a survey plat of the brownfields property

with the property boundaries clearly identified and a metes and bounds legal description of the property that matches the property description on the plat.  In order to submit the required survey plat of the Pennston property, the Claimant employed Evans Engineering Incorporated to prepare a detailed plat showing the boundaries of the Pennston property as well as additional information required in the final survey plat to be submitted later in the brownfields process.  The cost incurred by the Claimant in obtaining this survey plat was $7,465.40 as reflected in the bills from Evans Engineering (Claimant's Exhibit 43).  The Claimant is entitled to include the $7,465.40 paid to Evans Engineering in its claim.

   3.  Fees of Environmental Consultants

  There was no evidence that the Claimant incurred any expense for environmental consultants in connection with preparing and submitting the BFA.  Extensive testing and remediation reports were submitted with the BFA.  However, all of the environmental reports were already in existence and available to the Claimant as a result of the extensive environmental testing and reports done at the expense of the Debtor over a number of years prior to the submission of the BFA.  These reports contain extensive environmental information regarding both the Debtor's property and the Pennston property. Because of extensive nature of the previous environmental testing, remediation and reporting, which supplies

historical as well as current information, it appears that the Claimant likewise will not be required to incur expenses for environmental consultants in order to complete the brownfields process and obtain a BFA since the existing reports and information likely will suffice.

### 4. Attorney Fees

The Claimant employed the law firm of Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., to prepare the BFA. The attorneys began work on the BFA on October 4, 2010, completed the BFA on March 9, 2011, and followed up the submission of the BFA with various communications to DENR regarding the status of the BRA that extended through April 29, 2011. The Claimant was billed a total of $86,363.80 by the attorneys for the work performed between October 4, 2010 and April 29, 2011, consisting of attorney fees of $86,207.50 and expenses of $156.30. The Claimant has included these attorneys fees and expenses in its claim. The Debtor objects to the amount of the fees sought by the Claimant. The Debtor argues that the attorney fees sought by the Claimant are unreasonable and excessive and that the amount of attorneys' fees allowed should be reduced to a much smaller amount. This objection presents the first contested issue to be addressed by the court.

A basic rule that is applicable to both contract and tort claims is that the expenses or costs that are recoverable by an injured party must be reasonable in amount. See Pedroza v. Lomas

<u>Auto Mall, Inc.</u>, 716 F. Supp. 1031, 1040 (D.N.M. 2010) (the courts uniformly hold that the word "reasonable" should be implied in contractual-attorney fee provisions as a matter of public policy); <u>Butler v. Indiana Dept. of Ins.</u>, 904 N.E.2d 198 (Ind. 2009) (the extent of recovery by an injured plaintiff for medical expenses depends not on what was paid for the services but upon the reasonable value of the services); and <u>generally</u>, 22 Am. Jur.2d <u>Damages</u> § 438 (2010) (the fees and expenses incurred in prior litigation that may be recovered from an indemnitor must be reasonable in amount).  The stipulated issue in Exhibit C to the Final Pretrial Order is consistent with this tenet in that such stipulation provides that the amount that is recoverable is the "reasonable costs and expenses" incurred by the Claimant in obtaining a BFA.  This means that the court must determine the amount of attorneys' fees that should be allowed as reasonable for the preparation and submission of the BFA.

In developing the criteria or factors to be utilized in making this determination, the court has drawn upon the twelve-factor lodestar analysis set forth in <u>Barber v. Kimbrell's, Inc.</u>, 577 F.2d 216 (4th Cir. 1976)[3] as well as the factors set forth in section

---

[3]<u>See</u> <u>Harman v. Levin</u>, 772 F.2d 1150, 1152 (4th Cir. 1985)("we agree with the courts of appeals in the eighth and fifth circuits that the twelve-factor analysis of <u>Barber</u> is appropriate to determine attorney's fee awards in bankruptcy."). These factors, which were adopted from <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974), are as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions;

330(a)(3) of the Bankruptcy Code for determining what constitutes reasonable compensation for a professional in a bankruptcy case, and has concluded that the factors to be utilized in determining the reasonableness of the attorneys' fees in this case include the following: (1) the time spent on the services; (2) the rates charged for such services; (3) whether the services were necessary to the preparation and filing of the BFA; (4) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the work required for the preparation of the BFA; (5) the experience, reputation and ability of the attorneys performing the services; (6) the importance of the work undertaken and the result achieved; and (7) the amount customarily charged for the services involved in the preparation and filing of the BFA.

The information required for the first and second factors is reflected in the two bills that were submitted by the attorneys (Claimant Exhibit 26). These bills contain a description of the services performed by the attorneys, the date the services were performed, the identity of the attorney performing the services and

---

(3) the skill requisite to properly perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances of the engagement; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

a statement of the amount of time spent by the attorney in performing such services.    The total number of hours spent in performing the services described in the two bills is 283 hours. The hourly rates charged for the services provided by the attorneys were $290 increasing to $295 for Mr. Woosley, $375 increasing to $380 for Mr. Small and $400 increasing to $415 for Mr. House.

The third factor requires a review of what the attorneys were called upon to do, _i.e._, prepare and file a BFA, and an analysis of whether the services that were provided were necessary in order to prepare and file the BFA.    The fourth factor follows naturally after the third and asks whether those necessary services were performed within a reasonable amount of time, in light of the complexity, importance, and nature of the BFA preparatory work.

The preparation of the BFA involved filling out the BFA form with the information called for in the form and assembling the documents required by the form to be attached thereto.    The form is available on the Brownfields website maintained by DENR and consists of four main subparts.    Part I calls for specified information regarding the prospective developer as well as parent companies, subsidiaries or other affiliates of the prospective developer.    Part II calls for specified information regarding the proposed site such as ownership, size, location, regulatory agencies involved with the property, how the property is being used, manner in which the contamination has affected the use of the

property and planned use of the property if a brownfields agreement is obtained.  Part III is entitled "Other Required Information" and specifies certain documents that must be submitted with the BFA. Part IV consists of the form affidavit and preliminary agreement that must be executed by the applicant and submitted as part of the application.  The form is 12 pages in length plus the one-page affidavit form that must be signed on behalf of the applicant and the three-page Preliminary Proposed Brownfields Agreement that also must be completed and filed as part of the application.

The services included in the bills from the attorneys consisted of gathering the information and documents required in order to complete the application, the actual preparation of the application by preparing a form application containing such information and documents and submitting the application to DENR. The application prepared by the attorneys is 28 pages in length and includes 30 exhibits some of which were prepared by the attorneys and some of which consist of pre-existing documents and plats that were photocopied and attached as exhibits.

The fifth, sixth, and seventh factors return to broader considerations, and bring forth a series of contextual inquiries that require analysis of the circumstances of this particular application.  These factors focus not on the particular tasks, but how the fees compare to the marketplace as well as the importance, objective, and results of the application project.

- 23 -

To begin detailed application of the seven factors, the court will address the first factor, the time spent on the services. This factor calls for a broad perspective review of the quantity of time spent performing the services associated with the BFA. As previously noted, the attorneys billed a total of 283 hours. The vast majority of time was billed by Mr. Woosley, who billed 252.40 hours. Mr. House billed a further 23.5 hours, Mr. Small 4.9 hours, and the balance of 2.2 hours was billed by other attorneys and professionals. The court would observe that 283 hours is a substantial amount of time, the equivalent of more than seven weeks of work at forty billable hours per week. Naturally, a greater investment of time results in a larger total fee, and provides a most basic explanation of why a total fee is of a given magnitude. However, the court's inquiry is not focused on the basis of the total, but the reasonableness of the total, and hence, of its components. The reasonableness of particular units of billed time will be explored in more detail when discussing the third and fourth factors, below. However, considered broadly, 283 hours appears to the court to be an excessive amount of time to complete a single Brownfields Application. This observation alone cannot lead to a determination of what is a reasonable amount of time or fees; instead, it suggests a need for careful analysis of the billing items as undertaken below.

The second factor is the reasonableness of the hourly rates charged by the attorneys. As with the total hours billed, this factor also benefits from beginning with a broad overview analysis. There is no dispute that the attorneys each charged his own prevailing rate for the year in which services were rendered. However, this alone does not mean that the rates are reasonable. Instead, the court must consider the nature of the service rendered and determine what rate is commensurate with an appropriately skilled professional. See, e.g., In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 855 (3d Cir. 1994) (experienced attorneys doing junior attorney work should be paid junior attorney rates); In re Green Valley Beer, 281 B.R. 253, 258 (Bankr. W.D. Pa. 2002); In re Belknap, Inc., 103 B.R. 842, 845 (Bankr. W.D. Ky. 1989) (holding that "[s]enior partners should not perform services which could be as competently performed by associates or paralegals"). Broadly speaking, rates can be categorized as appropriate for senior partners, for junior partners, associates, and paralegals and non-attorney consultants. The rates charged by Mr. House and Mr. Small, ranging from $375 to $415, are senior partner rates, while the hourly rates charged by Mr. Woosley–$290 to $295–would be best considered junior partner rates. No associate attorney worked on the application, but based on the court's knowledge of the market, a junior or mid-level associate assigned the tasks that would be required in a application such as this would bill in the general

- 25 -

range of $200 to $215.  See, e.g., CoStar Group, Inc. v. LoopNet, Inc., 106 F.Supp.2d 780, 788 (D. Md. 2000) (citing several cases for proposition that in absence of other evidence, "the court may rely on its own knowledge of the market").  Paralegals and other billable support staff command rates around $90 to $100, which is consistent with the only such time billed on this application, 0.3 hours billed by a technical specialist at $95 an hour. Environmental consultants, such as those hired by the Debtor in this case, bill at rates in the range of $115 per hour, with variations depending on how specialized of a service that they have been called on to perform.

To further consider the reasonableness of the rates billed, it is necessary to describe the services rendered with greater particularity.  Such services vary by attorney.  Mr. House's services consist primarily of management of the project and conferencing with other parties, including the Debtor and DENR. These are services consistent with the role of a senior partner, and senior partner rates are reasonable rates to bill for such services.  Mr. Small's services initially related to sharing information regarding the site that he had become familiar with in the course of the bankruptcy case, then shifted to monitoring the status of the application.[4]  These services are also consistent

---

[4]Mr. Small also billed for two items specifically related to the instant litigation.  The Claimant has stipulated that such items were erroneously included.  The court adjusts for these hours

- 26 -

with role of a senior partner, and senior partner rates are reasonable rates to bill for such services.  Having billed the vast majority of hours, Mr. Woosley's services require more detailed discussion.  Based on the court's review of the bill and his testimony at the hearing, Mr. Woosley performed the following services: (1) marshaling and selection of existing figures and reports for submission with the application; (2) design and drafting of new exhibits for the application and their index; (3) review, analysis, and summarization of environmental reports for inclusion of information into the application; (4) research into the activities of the Claimant on the site; (5) researching and analyzing the corporate structure of the Claimant and its affiliates for inclusion in the application; (6) determination of the exact bounds of the property to be included; and (7) the actual drafting of the language to be included in the body of the application.   In support of these services, Mr. Woosley communicated extensively with his client and participated in numerous conferences with others in his law firm.

For some of these services rendered by Mr. Woosley, it is reasonable to charge a junior partner billing rate, as it would be ordinary for someone of that experience level to undertake a principal role in drafting an important legal document.  However, some of these tasks are well within the ability of a typical

---

when considering the necessity of the services.

associate attorney, and still others appear not to even require an attorney to complete. The design and drafting of exhibits is a task that should have been performed via supervised work of paralegals and associate attorneys. Data exhibits and tables can be compiled by a non-attorney under the general instructions of an attorney. Exhibits such as the description of affiliate companies, if not draftable by a paralegal from existing documents, would represent a straightforward discrete assignment for an associate attorney familiar with corporate matters. While a certain amount of analysis of environmental reports may be necessary, extensive review suggests that it would have been appropriate for an environmental consultant to prepare intermediate analysis of the reports in order to reduce the time spent by attorneys. Lastly, the research and analysis of the Claimant's corporate structure would have been best performed by a corporate associate, not a environmental partner. The corporate structure, while not simplistic, is not fraught with any significant legal issues, nor are the fine details of the various entities of any particular sensitivity to the end quality of the brownsfield application. Accordingly, the court will reduce the rate on exhibit-related and corporate structure tasks to $210, a billable rate for an associate attorney of suitable experience and ability, and further reduce data-table exhibit task to $95, a billable rate for non-attorney support staff. To the extent that extensive analysis of

environmental reports was required, the court will reduce that rate to $115, comparable to an environmental consultant. The court will further consider the reasonableness of time spent, and once any appropriate adjustments, if any, are made to hours billed, these adjusted hourly rates will be applied.

The court will now continue to the third factor, whether the services were necessary to the preparation and filing of the BFA, and the fourth factor, whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the work required for the preparation of the BFA. These factors overlap to some degree, as services that were marginally important to the completed BFA could be characterized as either partially necessary and partially unnecessary, or as not completed within a reasonable amount of time. The court will first consider areas where services were entirely unnecessary, and then move into excessively time consuming services.

Before analyzing the particular services described in the foregoing discussion, the court will consider the broader question of what makes a service necessary to the brownfields application. One complicating factor is that the law firm was not retained exclusively for the purpose of preparing the application. On the contrary, the firm appears to have a long-standing relationship with the Claimant and its corporate affiliates, including having

represented it throughout this bankruptcy case.  This observation is not meant as a criticism of having one firm perform multiple services-such is often efficient for both the firm and the client. Instead, it means that charges may exist that are perfectly reasonable as between the firm and the Claimant, but not as between the Claimant and the Debtor, as they furthered other interests of the Claimant beyond the narrow scope of the work on the brownfields application for which the Debtor's responsibility for reasonable costs is confined.

In addition to services that are more closely related to other matters where the firm is employed by the claimant than to the BFA, there may be services that are closely related to the BFA but not necessary to deliver an appropriately thorough application that is responsive to the information requested by DENR.  In some cases, additional information included at the application phase will reduce the work required at the negotiation phase which occurs after an eligibility determination.  In that event, as the Debtor would have been responsible for the costs in the negotiation phase, there is no need to disallow services that were reasonable, albeit premature.

The fourth factor moves beyond necessity to consider the related question of whether the time spent rendering a service was commensurate with the complexity of the service and its relative importance to the application.  Such encompasses both the situation

where the attorneys have spent too much time on a simple task and
the situation where the attorneys have delivered time-consuming
complex work product where simpler services should have been
delivered.    In the first situation, the firm is expected to
exercise billing discretion and not bill for services that were,
e.g., repetitive, avoidably inefficient, or unproductive to the
project. See In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d at 856;
In re F.B.F. Indus., Inc., No. 91-24613DWS, 1995 WL 691893 at *4
(Bankr. E.D. Pa. Nov. 15, 1995) (billing judgment required).  Just
as a client might decline to pay charges where billing discretion
was not exercised, the court will decline to allow such charges as
reasonable. Id. at 856.    In the second situation, when legal work
is performed with the expectation that a third-party will be
responsible for the cost, the attorneys may not far exceed the
level of quality and detail necessary to the legal task.  See,
e.g., In re McGuier, 346 B.R. 151, 164-65 (Bankr. W.D. Pa. 2006)
(no "'blank check' to incur attorney fees and costs with the
expectation it will be automatically reimbursed"); see also Ursic
v. Bethlehem Mines, 719 F.2d 670, 677 (3d. Cir. 1983) ("Routine
tasks, if performed by senior partners in large firms, should not
be billed at their usual rates.  A Michelangelo should not charge
Sistine Chapel rates for painting a farmer's barn.").

    At the hearing, the Claimant stipulated that two services that
had been billed were not adequately related to the preparation of

the BFA to be included in the costs borne by the Debtor.  First were 1.1 hours by Mr. Small, billed totaling $414.00, related to the claims litigation.  Second was eight hours of time concerning the conveyance of land to adjust the border of the brownfields tract.  This time was billed by Mr. Woosley, and concerned conferences with Edgar Fisher, another partner at the firm. Claimant agreed that removing these hours would reduce the bill by $2,500.00.

With the 1.1 hours of litigation time removed, Mr. Small has 3.8 hours billed to the BFA project.  The first 0.3 hours, on October 4, 2010, are for intra-office emails with Mr. House regarding moving the BFA forward.  The timing of these emails on the day prior to the October 5, 2010 status conference with this court leads the court to conclude these should also be disallowed as claims litigation cost.  Mr. Small next billed a total of 2.0 hours on two days in November 2010 for conferences related to background information for Mr. Woosley.  While it is not apparent that this was the only way to get this information for Mr. Woosley, given the complex history of the case, it may well be a reasonable way to have done so.  Mr. Small's remaining 1.5 hours where billed over five dates, and can be best characterized as monitoring of the BFA progress.  Certainly, Claimant's lead bankruptcy counsel needs to remain informed about the application status.  However, such is unnecessary for the application itself, and must be excluded from

costs chargeable to the Debtor.  In total, the court will reduce the bill as related to services rendered by Mr. Small a further 1.8 hours or $680.00.

A number of the services rendered by Mr. Woosley require careful scrutiny for whether they were necessary for preparing and submitting the BFA, and for whether they were completed in a reasonable amount of time.  The court will first consider services related to the preparation of exhibits.  While the Debtor has challenged some exhibits as being entirely unnecessary and of little relevance, for the most part, the exhibits do contribute to the overall application.  However, the Claimant and its professionals must exercise some measure of restraint when performing services to be billed to an adverse party.  At some point, work is subjectively good enough for the task at hand, and the Claimant cannot opt to far exceed that level of quality and pass on the cost.  The exhibits are an area where the court finds the Claimant's attorneys undertook more effort than necessary to prepare a successful brownfields application.  For example, four exhibits spanning eight pages are devoted to the corporate structure of the Claimant and its affiliates.  While an excellent description of this joint venture company, it goes beyond the needs of the application.  DENR's principle concern with affiliates relates to the eligibility considerations of not having contributed to the site contamination and past performance in any matters

involving environmental contamination.  The Claimant's responses in
the body of the application appear to provide the detail required
by DENR.  A further example, which the Debtor raised as a concern
at the hearing, is the preparation of exhibit 15, a table of
groundwater depths which Mr. Woosley prepared.  The evidence tended
to show that this exhibit, meant to illustrate the lack of contact
with the groundwater, was unnecessarily detailed and attempted to
disprove contact that DENR would not have been concerned about,
given the absence of any chlorinated solvents in the Claimant's own
development operations.  It cannot then be said that preparation of
this table was necessary to the BFA.

Faced with the question of how to properly reduce the hours
and charges associated with these unnecessary services regarding
exhibits, the court is confronted with how to quantify individual
services that are represented within the bill only by lumped
entries.  These lumped entries contain as much as 9.2 hours of
legal services without further itemization of the time spent on the
various services lumped together in the entry.  Courts reviewing
attorneys' fees have had numerous occasions to consider how to best
address lumped bills.  See In re McGuier, 346 B.R. 151, 164 (Bankr.
W.D. Pa. 2006) ("Unitemized disbursements for services 'lumped' or
'bundled' together in a single entry thereby inhibiting the Court
from determining the reasonableness of the individual services
rendered and necessity/value of the service to the estate is a

- 34 -

practice universally disallowed."); <u>In re Ward</u>, 190 B.R. 242, 246-47 (Bankr. D. Md. 1995) (noting some courts refuse to compensate lumped entries and others make global percentage adjustments); <u>see also In re Green Valley Beer</u>, 281 B.R. 253, 258-59 (Bankr. W.D. Pa. 2002); <u>F.B.F. Indus.</u>, 1995 WL 691893 at *7.  In this case, the court believes that disallowing any lumped entry that contains an unreasonable charge would be unduly harsh.  The practice the court will employ is to estimate time spent on a task, based on the nature of other tasks in the same lump, the total frequency of the task, and apparent work product arising from that task. Furthermore, the court will presume that entries concerning general tasks such as drafting or conferring with clients and colleagues are related to explicit tasks lumped into the same entry.  The court recognizes that such estimation is not an exact science, and there is the possibility that the court will overestimate. However, the Claimant has the burden of proof, and by choosing to tender lumped bills as evidence of reasonableness, bears the risk this court will calculate an unfavorable estimate.  <u>See Ward</u>, 190 B.R. at 247 (reductions on lumped entries are based on a "failure to sustain its burden of proving the reasonableness of fees provided").  Bankruptcy counsel for the Claimant is experienced with fee applications in other bankruptcy contexts, and is aware of the type and detail of information used by bankruptcy courts in those contexts.

As reflected in the attorneys' bills, Mr. Woosley worked on exhibit related tasks some twenty-four different days. While these twenty-four entries total 119.2 hours, the court, upon line-by-line examination would estimate only a total of 39.6 hours concerns exhibit related tasks. Of these 39.6 hours, 5.5 hours pertained to drafting the groundwater depth table. The court will exclude the 5.5 hours regarding the groundwater table in its entirety, resulting in a $1,622.50 reduction. For the remaining 34.1 hours of exhibit work, the court will reduce the hours by one-half, to 17.05 hours, resulting in a $5,009.00 reduction. Furthermore, as discussed earlier, a junior partner rate is unreasonable for drafting the exhibits, and the court will reduce the rate to $210 for the exhibit work, a further $1,428.50 reduction. The court's total reduction related to unreasonable exhibit preparation services is $8,060.00.

Moving on to further services, the court will now consider the review, analysis and summarization of environmental reports performed by Mr. Woosley. The BFA includes a section describing the proposed site, including a description of the contamination. The application as submitted covers this information over the course of four pages. Further sections contain shorter mentions of aspects of contamination. The numerous environmental reports and studies of the Debtor's and Claimant's properties were the underlying source of the information, and the text in the BFA

generally includes express reference to the source report. The nature of contamination is of central interest to DENR, and review of reports in order to enable drafting an accurate account of the contamination appears to the court to be necessary to the preparation of the BFA, and no reduction is required under the third factor.

As previously discussed, that a service was necessary does not preclude it from having been rendered using an unreasonable amount of time. Here, the court finds that time spent reviewing, analyzing, and summarizing environmental reports was not commensurate with the complexity, importance and nature of work required. Review of the attorneys' bill reveals entries by Mr. Woosley on 25 separate days where work was performed regarding these reports, totaling 106.9 hours. As with the exhibit work, the vast majority of these entries reflects some degree of lumping. The court has examined each of these entries to estimate the portion relevant to the report analysis tasks, and would conclude that a total of 50.9 hours were so spent. Such is not a reasonable amount of attorney time given the nature of the task of summarizing environmental information or the relative importance of the environmental data. While a certain amount of environmental information is essential to the BFA, the same cannot be said about a comprehensive analysis of most, if not all, of the environmental data available. Here, there are two choices that would have been

reasonable.  One choice would be for an attorney to prepare the summary of reports, carefully limiting such to the most relevant reports and the key information highlighted by the authors of these reports.  Another choice would be to hire an environmental consultant to perform a comprehensive summary study of existing reports.  For the first choice, the court would find 20 hours to be a reasonable amount of attorney time, which amount to a total charge of $5,840.50, a reduction of $9,039.00 from the current $14,889.50 in charges associated with the 50.9 hours of work.  For the second choice, the court would expect that an expert consultant would be faster in summarizing reports, taking approximately 40 hours to generate a comprehensive summary, with a further 5 hours of attorney review and supervision.  At a rate of $115 an hour for the consultant and $295 an hour for the attorney, such choice would cost $6,075.00, somewhat more expensive than the summary review by the attorney.  Using the more expensive of the two reasonable alternatives, the court will reduce the charges related to environmental reports from $14,889.50 to $6,075.00, a $8,814.50 reduction.

Mr. Woosley also performed services related to the analysis of corporate structure and history of the Claimant and affiliates, including reviewing existing records, documenting ownership interests and corporate form, addressing ambiguities, and drafting responses to insert within the application.  Mr. Woosley also

prepared a number of exhibits pertaining to corporate structure, which the court has previously considered and reduced the fee accordingly.  Within the body of the application, approximately four pages are spent describing the corporate structure and ownership, with additional text in the application amongst the sections describing the history and capabilities of the Claimant as prospective developer.

One of Reedy Fork Investment LLC's parent entities is organized as a limited liability limited partnership (LLLP), as are several of its affiliated entities.  The existence of LLLP registration appears to have caused either confusion or concern amongst the Claimant's attorneys.  As such, investigations, inquires and conferences regarding LLLP status occurred multiple times through the months of December 2010 and January 2011. Claimant has failed to explain why achieving a high degree of clarity regarding LLLP status was important to the BFA.  This is either a service of benefit only to the Claimant and not to the Debtor and the application, or an unnecessary research tangent upon which the attorneys should have exercised greater billing discretion.[5] In either event, the court finds that under the third factor, the services related to LLLP status were unnecessary to the

---

[5]Mr. House's entry on 1/24/2011 suggests the issue was of some import to his client: "Review Davidson memo on results of change to LLLP and email Woosley and Davidson regarding conveying same information to Hubbard; telephone conference with Wilson regarding resolution of 'LLLP' issue and possibility of settlement."

preparation and filing of the brownfields application.  Based on a review of the lumped entries, the court estimates Mr. Woosley spent 4.7 hours on the LLLP issue, Mr. House 1.3 hours, and Mr. Davidson, another partner of the firm, a further 1.5 hours.  The court will disallow the charges associated with all of this time, in total sum the amount of $2,490.50.

Beyond the LLLP matter, analysis of the bill suggests that Mr. Woosley spent a further 32.4 hours on matters related to corporate structure and history.  This information is directly responsive to the BFA, so it cannot be said to be unnecessary.  Given the size and complexity of the Starmount and Hubbard enterprises that own the Claimant, it is reasonable that some amount of time be spent in this area.  Nevertheless, the court is of the opinion that 32.4 hours is not commensurate with the complexity of the work required, and will reduce such under the fourth factor by one-fourth to 24.3 hours.  The task, while somewhat tedious to perform, amounted largely to gathering and organizing existing, non-controversial information about the Claimant.  Furthermore, as discussed earlier, this task would have been most efficiently assigned to a mid-level corporate associate, billing at a rate of approximately $210.  This represents a reduction of $4,313.50 from $9,416.50 for 32.4 hours to $5,103.00 for 24.3 hours.

Determination of the exact bounds of the brownfields site is the next service rendered principally by Mr. Woosley requiring

analysis under the third and fourth factors. This task was complicated by the fact the boundary of the Pennston tract did not correspond exactly with the area of suspected contamination. From the bill, it appears there was initially consideration of including affiliate Reedy Fork East LLC as a prospective co-developer, before the Claimant decided instead to convey land to and from Reedy Fork Investments so that its real estate holdings would exactly correspond with the proposed brownfields site. Definition of the site is responsive to the application and necessary to complete it, so the third factor is not at issue. Instead, the question is whether the time spent is reasonable in light of the task.

From a review of the bill, the court estimates Mr. Woosley spent 18.6 hours on issues related to determining the exact boundary of the brownfields site. This would appear to be an excessive amount; however, the Claimant has already stipulated to the removal of 8 hours or $2,500 pertaining to the deed-related activities, as noted earlier. This reduction is adequate to address the excessiveness in time spent on site definition, and the court will not reduce the bill further.

In concluding the analysis of the time spent by Mr. Woosley on services related to the BFA, the court will briefly examine time spent drafting the application itself. In addition to drafting tasks specific to services already discussed above, a review of the bill reveals another 23 entries which include time drafting or

revising the body of the application.  The court would estimate the time spent on these 23 occasions as totaling 33.4 hours and billed at $9,751.00.  The body of the application, excluding the summaries of the corporate structure and the environmental reports, which the court has separately addressed, is 19 pages long.  The text is generally responsive to the application, so the third factor would not require a reduction due to unnecessary work.  However, the time spent is not reasonable.  Work is most efficiently performed by minimizing the number of times one switches between tasks.  Here, drafting and re-drafting small amounts of the application on 23 separate occasions does not reflect an efficient plan of work, and the Claimant has not explained any particular necessity in completing the work in this manner.  Indeed, such is typical of the work on this project, on which work was performed on 76 separate dates.  Reflecting this inefficiency, the court will reduce the time by 0.2 hours for each entry, or a total of 4.6 hours.  Calculated at the applicable rates, this results in a $1,343.00 reduction.

In summary of the analysis thus far, the Claimant has stipulated to the reduction of the fee bill by $2,914.00, and the court has found further reductions of $25,701.50 to be appropriate.  The total reduction is $28,615.50, which reduces the bill from $86,207.50 to $57,592.00, a reduction of 33.2%.  These reductions are summarized in the table produced below:

|  | Fee Reduction |
|---|---:|
| **Stipulated Reductions** | |
| Litigation - Mr. Small | $414.00 |
| Deed Issue with Mr. Fisher | $2,500.00 |
| Subtotal | $2,914.00 |
| **Other Reductions** | |
| Litigation/Monitoring - Mr. Small | $680.00 |
| Exhibit Work | $8,060.00 |
| Environment Report Analysis | $8,818.50 |
| LLLP Issue | $2,490.50 |
| Corporate Structure | $4,313.50 |
| Drafting & Re-drafting | $1,343.00 |
| Subtotal | $25,701.50 |
| Total Reduction | $28,615.50 |

The fifth factor calls on the court to evaluate the experience, reputation and ability of the attorneys performing the services. Generally, it is reasonable for more experienced attorneys to command higher hourly billing rates. Here, the court is satisfied that primary attorneys involved have sufficient experience, reputation and ability to command their respective rates for services they reasonably performed. While their fees are at the upper end of the local market, Mr. House and Mr. Small both have extensive experience in their respective fields and enjoy leading reputations in those areas. Mr. Woosley's rate is reasonable for an attorney with his experience, including his

previous experience with completing brownfields applications.  The court will not reduce the fees on account of this fifth factor.

The importance of the work undertaken and the result achieved is the sixth factor to be considered.  This reflects the notions that attorneys taking on highly critical work where the consequence of failure is significant deserve more compensation, and that achieving extraordinary results should be rewarded.  Here, the brownfields application was an important step in obtaining a brownfields agreement which would facilitate the future development of the Pennston tract.  The Claimant has obtained an eligibility determination from DENR, a desired result of retaining counsel to file the brownfields application.  Evidence before the court suggests that the fact that Claimant presently owned the site and had done work upon it added complexity that made obtaining eligibility non-trivial.  Nevertheless, a favorable eligibility determination appears to be the expected and legally proper result, one that required ordinary, but not extraordinary, skill to obtain. The court concludes that this factor suggests no upward or downward adjustment to the attorneys' fees.

The seventh and final factor, the amount customarily charged for the services involved in the preparation and filing of the BFA, presents an interesting series of questions.  Unlike in most contexts, where such a factor would invite comparison only to other attorneys' services, use of non-attorney environmental consultants

to prepare a BFA is also commonplace and must be considered in comparison. However, it cannot be said that attorney prepared applications and consultant prepared applications are completely fungible. Instead, some projects are more suitable to have a certain sort of professional involved in the application drafting. When more legal issues are present, involvement of attorneys is more important. Similarly, complex environmental data sets might be most effectively related by a scientific consultant. Therefore, an initial question is what sort of professionals would be customarily called upon to prepare an application for a similar prospective brownfields site.

For the Pennston tract, complexities arise in a number of areas. For one, there has been a great deal of environmental assessment performed on the site, and quite a few environmental reports. While the court has received opinion testimony that there was more than the average amount of assessment data for a typical BFA, evidence is inadequate to quantify how unusual or complex this magnitude of information might be. Additionally, many prospective brownfields developers do not yet own their site, and never undertook any activity on the site. While activity alone is not a concern, activity that contributed to the contamination would render a developer ineligible. Here, all activities undertaken by the Claimant in its seven years of ownership had to be reviewed to ensure no contribution to the contamination. Lastly, the

environmental track records of a prospective developer's owners and affiliates is relevant for determination of eligibility. Here, the prospective developer is a joint venture between two large development enterprises with a complicated structure of entities and long history of past projects.

While voluminous environmental data would suggest that an environmental consultant is appropriate to prepare part of the application, the presence of issues that could affect the legal eligibility of the developer under the North Carolina Brownfields Reuse Act suggests this site is one where attorney involvement in preparation of the application was valuable. Testimony presented by the Debtor established that an environmental consultant would draft an application for a complex site for $7,500. However, the Debtor's expert acknowledged that an attorney would commonly become involved after the consultant's draft was prepared, and was unable to quantify what a typical attorneys fee might total. In light of the possible pitfalls in areas concerning eligibility, it seems likely to the court that further attorneys fees in a case such as this could readily exceed the consultant's fee. Accordingly, this application is representative of one that would be prepared either by a consultant with attorney involvement, or primarily by attorneys.

That the Claimant potentially could have saved money by hiring a consultant to take the lead in drafting the application does not

mean that hiring an attorney in the lead role was unreasonable, or that the customary charge of such lead attorneys is not the correct metric to judge the charges under the seventh factor.  The Debtor must take the victim of its contamination as it finds such victim. It would have been less complex and expensive if the owner of the contaminated property had been an entity with no affiliates and who did not already own the property.  But such is not the case, and the consequence to the Debtor is greater cost.

The court has adjusted the attorneys fees under the prior six factors down by $28,615.50 to $57,592.00, which amounts to a 33.2% reduction.  Given the foregoing discussion, the court cannot say such a figure is out of line with the customary charges for an attorney-prepared application for a similar site and prospective developer.  Accordingly, no further reduction will be made, and $57,592.00 will be awarded as the attorney fee to-date portion of the reasonable costs for obtaining a brownfields agreement.  No issue has been raised regarding the expenses of $156.30 billed by the attorneys, and these will also be included within the claim.

In addition to the attorney fees incurred to date, additional costs will be incurred by the Claimant in negotiating and executing the final brownfields agreement.  The Claimant estimated these costs at $10,000.00 but provided no explanation or breakdown as to how the Claimant arrived at this figure.  As previously noted, the application in this case included significant amounts of

environmental data, including full copies of all existing assessment reports, which makes it unlikely that DENR will require extensive supplemental information to be submitted. This likely will mitigate the time and expense that otherwise could be anticipated in finalizing a BFA. At the same time, there undoubtably will be some points that require negotiation by the attorneys such as the exact nature of the land use restrictions to be included in the agreement. Taking all of this into account, the court concludes that $7,500 is a reasonable amount to be allowed for the future attorneys fees related to finalizing a BFA.

5. Internal Costs

Another item of expense referred to in Exhibit C to the Final Pretrial Order is "the internal costs necessary to prepare and submit a development plan to the extent necessary to comply with the requirements of the Brownfields Program application. . . ." No evidence that quantified or substantiated any such costs was presented at the trial and, therefore, no amount will allowed for this item.

6. Implementation Costs

The remaining issue is the amount, if any, that should be awarded as the cost of implementing the brownfields agreement, once approved. The Claimant argues that the cost of implementing the brownfields agreement should include the future costs of complying with any land use restrictions, including the potential restriction

concerning soil vapor intrusion. While the evidence established
that an allowance should be made for some implementation expenses[6],
such was not the case with respect to an allowance for expenses
based upon a soil vapor land use restriction.  Such an allowance
depends upon a showing that a soil vapor land use restriction most
likely would be included in the BFA and that the Claimant would
incur expenses in order to implement such a land use restriction.
The Claimant failed to establish either of these requirements.

The evidence regarding whether the land use restrictions in
the BFA would include a restriction requiring soil vapor testing or
soil vapor remediation was conflicting.  In support of the argument
that the BFA would include such a land use restriction, the
Claimant relied almost entirely on a letter from a DENR employee
stating his "first-blush perspective" regarding the land use
restrictions "likely" to be included in a BFA.  This letter was
written before the property had been accepted into the program and
prior to any discussions or negotiations with DENA regarding the
likelihood of soil vapor intrusion on the property and whether such
restrictions should be included in the BFA, and was written by an

---

[6]The only expenses related to implementing the anticipated BFA
that were supported by the evidence were expenses related to
recording the land use restrictions in the Guilford County Registry
and the Claimant having to filing annual compliance reports with
DENR.  Given the  evidence that these requirements could extend
over a period of several years, but could be handled without
significant involvement of professionals, the court will allow
$2,500 for these expenses.

individual who was not present in court to be cross examined about
relevant matters such as his familiarity with the extensive
environmental testing at the site, the fact that the Claimant's
projected use of the property is commercial rather than
residential, etc.  In opposition to this claim, the Debtor relied
upon two highly qualified expert witnesses who were familiar with
the extensive environmental testing conducted on the Claimant's
property as well as the brownfields program.  Mr. Moretz, who was
involved in much of the testing and also had extensive experience
with the brownfields program, was of the opinion that the risk of
soil vapor intrusion on the Claimant's property was highly unlikely
and that remediation of soil vapor intrusion most likely would not
be required on the Pennston tract.  Ms. Jones who was employed with
DENR for 17 years before taking a job in the private sector,
including more than three years processing brownfields applications
in DENR's brownfields division, after reviewing the soil vapor
sampling and risk assessment work already done, was of the opinion
that the Claimant should be able to obtain a BFA without a soil
vapor land use restriction.   Having considered and weighed the
conflicting evidence, the court concludes that the Claimant failed
to show by a preponderance of the evidence that a soil vapor land
use restriction more likely than not would be included in the
Claimant's BFA.

The evidence also failed to show that any implementation costs that might be incurred if a soil vapor land use restriction were required, would be incurred by the Claimant.  Costs related to soil vapor testing or remediation would not arise upon the granting of a BFA.  Instead, such costs would arise later in the course of building and development on the site and thus would be borne by whomever actually develops the site.  According to the evidence, including the Claimant's statement of intended use in its brownfields application, the Claimant's intended use of the Pennston property is to sell the property to developers rather than building on and developing the property itself.  Thus, if there are to be expenses related to testing for or remediating soil vapor intrusion, the evidence failed to show that any such expenses would fall on the Claimant.

B.  Diminution Damages

The remaining issue is the amount which should be allowed for any diminution in the value of the Pennston property as a result of the environmental contamination.  The Claimant contends that the total amount that should be allowed for diminution in value is $990,000.  As with the other elements of its claim, the burden of proving the amount of any diminution in value lay with the Claimant.  See In re Paoli Railroad Yard PCB Litigation, 113 F.3d 444, 463 (3rd Cir. 1997) (party claiming diminution damages from stigma resulting from contamination has burden of proving such

stigma).  The Claimant's evidence fell far short of establishing that there was a diminution in value even approaching the figure asserted by the Claimant.

The Claimant relied almost entirely upon the testimony of James D. McNairy, III, who was proffered and accepted as an expert in real estate appraisal.  Mr. McNairy appraised the property and made an assessment regarding the effect of the contamination on the value of the property on behalf of the Claimant.  Mr. McNairy calculated the amount of the diminution by first determining the market value of the Pennston property in a hypothetical uncontaminated condition and then determining the market value of the property as contaminated, with the difference in the two values being the amount of the diminution in value.  In arriving at the value of the property in its contaminated state, the witness determined a percentage by which the hypothetical value should be reduced as a result of the contamination. The percentage of diminution was then applied to such value which yielded the value of the property in its "as is" condition.  The rest of the calculation is mathematical involving subtracting the "as is" value from the hypothetical value to arrive at the amount of the alleged diminution.

In determining the hypothetical market value of the property, Mr. McNairy used the Sales Comparison Approach which involves the comparison of properties deemed to be similar that have been

recently sold, with the subject property, and in which the comparable properties are compared to the subject property with regard to differences or similarities in time, age, location, physical characteristics, and the conditions influencing the sale. This value range, as indicated by the comparable properties, is then reconciled into a final indicated value for the subject property by this approach.   In making his comparisons in this manner, the witness utilized a per-acre unit of comparison and after concluding a per-acre value for each parcel, the total value was calculated for each tract, reflecting the value as unimpaired by contamination.

Under this approach, the determination of the hypothetical market value of the property obviously is critical since that figure, along with the percent figure for the diminution resulting from the contamination, will determine the amount of the loss resulting from the contamination.

In providing his opinion regarding the hypothetical market value of the property, Mr. McNairy broke his appraisal down into three separate figures.   He first analyzed the parcel referred to as section A1, located immediately eastward of the Wysong property, south of Reedy Fork Parkway and northwest of Eckerson Road.   Based on a survey supplied by the Claimant, he treated this parcel as

having 8.53 acres, all of which were buildable acres.[7]  Based on a
$90,000 per acre valuation opinion, he concluded that Section A1
would have a fair market value of $770,000.00 if uncontaminated.
In reaching this conclusion, he determined that residential or
limited office/business use would be the highest and best use of
the property in light of the nature of the property, the
surrounding area, and the local marketplace.  To pinpoint a per-
acre value, he selected three past sales as comparable sales, and
then applied subjective adjustments to account for differences in
contrast to those past sales.  These comparables consisted of a
pair of properties sold in July and August of 2008 at 5220 and 5214
West Wendover Avenue in Greensboro and a third tract near Fleming
Road, also in Greensboro, sold in October 2007.  The West Wendover
Avenue properties sold for $1,000,000 and $1,577,000, for 10.00
acre and 17.07 acre tracts, respectively.  The third, a 2.70 acre
tract, sold for $507,500.00.  Upon each comparable, Mr. McNairy
considered adjustments for financial conditions, market
considerations, location, site size, zoning, and utilities.  For
5220 West Wendover Avenue, he adjusted only for location, finding
it to be slightly more favorable in location, thereby adjusting the
price per acre down to $90,000.  For 5214 West Wendover Avenue, he

---

[7]The total acreage of these parcels has been reduced by the
right-of-way dedications for the two roadways, and 53.66 acre tract
is further reduced by a 21.34 acre dedication along the creeks for
flood plain and open space.

added to the location adjustment an upward adjustment for the fact the comparable is larger than Section A1, leading to an adjusted price per acre of $87,765.00. The witness made the most adjustments for the Fleming Road property. First, he adjusted downward by 5% for more favorable market time conditions in 2007 than 2010. Second, he adjusted downward by 40% for the superior location of the comparable. Lastly, he adjusted downward by 10% due to the smaller size of the comparable property, resulting in a final adjusted value of $89,415 per acre. Based on the more recent nature of the sales and fewer adjustments, the adjusted value of $90,000 per acre was selected as the value for Section A1.

Mr. McNairy followed a similar pattern for the other two parcels. For section A2, located across Eckerson Road from Section A1, and compromising the southeastern corner of the Pennston tract, he appraised a total value of $1,070,000.00 based on a buildable acreage of 11.89 acres and a per acre value of $90,000. This per acre value was arrived at from analysis of the same three comparable sales as with Section A1. For two of the comparables, 5214 West Wendover Avenue and 2200 Near Fleming Road, he decreased the size related adjustment on account of Section A2 being somewhat larger than Section A1, resulting in adjusted prices per acre of $85,917.00 and $79,937.00, respectively. Despite his assertion within the comparable analysis that larger parcels are less valuable per acre, he nevertheless concludes that $90,000 per acre

is also the value of Section A2, purportedly placing more weight on the "most recent" sales of the two West Wendover Avenue parcels, but actually allowing the 5220 Wendover property to predominate.

The last parcel appraised was Section A3, the largest parcel of the Pennston tract consisting of 40.65 acres and located to the north of Reedy Fork Parkway.  Mr. McNairy appraised a total value of $2,130,000.00 derived as a value of $75,000 for each of the 28.40 buildable acres of the parcel.  Again paralleling the other two appraisals, he selected the same three comparables in Greensboro.  Recognizing that Section A3 is larger than any of the comparables and of the other parcels of the Pennston tract, Mr. McNairy applied a large size adjustment, resulting in adjusted values of $75,000 for 5220 West Wendover, $78,527 for 5214 West Wendover, and $62,590 for 2200 Fleming Road.  Again preferring 5220 West Wendover, he selected $75,000 as the appropriate value for the appraisal.

After carefully considering the report and testimony of this witness, the court is unable to find that his reports and testimony are sufficient to constitute evidence that would support a finding that the three parcels have the values attributed to them by the witness.  The witness relied upon the same three comparables in appraising all three of the Pennston parcels.  Two of the three parcels are tracts fronting on Wendover Avenue and are located between and in close proximity to both Greensboro and High Point.

The characteristics of the area in which these two tracts are located differ in so many significant respects that it is highly questionable whether they could be considered reasonable comparables for an appraisal of the Pennston property. Wendover Avenue is one of the main connectors between High Point and Greensboro. The density and stage of development of both the residential and commercial development in the area is far greater than that in the vicinity of the Pennston property. This deficiency is greatly magnified as a result of the witness making only a 10% adjustment because of the more favorable location of the two Wendover Avenue tracts. Such an adjustment is far too small to account for the degree to which the location of the Wendover Avenue properties is superior to that of the Pennston property. While the witness made a 40% location adjustment to the third comparable, a 2.70 acre tract located near Fleming Road (involving a much smaller sales price), it was unclear from the evidence why the Wendover Avenue adjustment for location was so much smaller. Moreover, even though the three Pennston tracts ranged in size from 8.53 to 40.65 acres, the witness used the much smaller 2.70 acre Fleming Road property as a comparable for all three of the Pennston tracts. While an adjustment was made because of the smaller size of the Fleming Road tract, the adjustments to the Fleming Road property for size were only 10% for Section 1A, 15% for Section 2A and 25% for Section 3A despite the much smaller size of the comparable.

The exposure time involved in all three of the McNairy appraisals is "approximately one year." According to the appraisals, exposure time is the length of time the property would have been offered on the market prior to the hypothetical consummation of a sale on the valuation date at the appraised market values. Utilization of a exposure time of only one year in order for the Claimant's vacant and undeveloped property hypothetically to sell for a total of $3,970,000 is unrealistic and fails to take into account the extremely poor economic conditions that prevailed during the three years preceding the June 18, 2010 valuation date, and which continue with little improvement. As pointed out by the Debtor's appraiser, an exposure time of three years is much more in keeping with the poor economic conditions that prevailed for the period preceding June of 2010 and which essentially remain unchanged, and which have resulted in a paucity of transactions involving the sale of vacant and undeveloped property in the past three or four years. Finally, and of particular significance, was the inability of the witness to provide responsive, informative answers to questions regarding his appraisal that were presented during his examination, particularly during cross examination.

In short, taken as a whole, the Claimant's evidence regarding the hypothetical value of the Claimant's property if it were not contaminated was insufficient to support a finding that the property would have had a value of $3,970,000 as of the valuation

on June 18, 2010, as testified by Mr. McNairy. Given the number and type of deficiencies in his appraisal, the court is satisfied that the $3,970,000 figure is greatly inflated and far in excess of the fair market value that the property would have had on June 18, 2010. Moreover, given the deficiencies in the Claimant's evidence regarding such value, it would be highly speculative and a matter of conjecture for the court to attempt to divine a market value from such evidence, and the court declines to do so.

The court likewise found Mr. McNairy's reports and testimony regarding the effect of the contamination upon the value of the Pennston property unconvincing. Each of Mr. McNairy's appraisal reports includes a discussion of the impact of contamination upon the value of the parcels. (Claimant Exhibit 22, pp. 55-58, Exhibit 23, pp. 53-57, Exhibit 24, pp. 53-57). The analysis in each of the three appraisals is essentially the same. His discussion focuses on hypothetical scenarios where the parcel has a brownfields agreement requiring various land use restrictions. While observing that contamination comparables are difficult to obtain, he identifies three properties and characterized the impact that contamination had on each as follows. The first, a property on Church Street in Greensboro, initially contracted to sell for $185,000 and eventual sold for $160,000 after contamination was discovered and addressed. In addition to the costs arising from remediation, he concludes that this property experienced a stigma

related loss of $25,000 in value, or 13.5%.  A second property, on
Rock Quarry Road in McLeansville, sold at $525,000, a value loss of
25% over its list price of $700,000.00.  A third, on East Friendly
Avenue in Greensboro, was sold at $2,230,000 after the buyer carved
out and did not purchase 1.183 contaminated acres of an initial
5.121 acre track appraised at $2,900,000.  From those facts, Mr.
McNairy concludes that the third example suffered a 23% loss of
value due to contamination.  Mr. McNairy states in his reports that
the preceding "market evidence" is "relevant" in considering the
loss of value to the Pennston property.  Then, without further
analysis, he concludes in each of his reports that a loss in value
of 25% to the Pennston property is "reasonable and appropriate."
(Claimant's Exhibit 22, pp. 55-56).  Mr. McNairy then addresses the
effect that the inclusion of additional land use restrictions would
have on the amount of the diminution in value.  He concludes that
the diminution would not be increased if the land use restrictions
applicable to the property also included a restriction prohibiting
removal of subsurface materials to a depth greater than 20 feet
below ground surfaces, a restriction requiring each owner of the
property to submit a report annually to DENR confirming that it was
in compliance with the land use restrictions, a restriction
requiring any instrument transferring any interest in the property
include a provision that the transferee was required to comply with
the land use restrictions and permit access required by DENR for

assessment or remediation, and a restriction requiring that a declaration of perpetual land use restrictions be recorded in the Guilford County Registry. It apparently was felt that these additional land use restrictions would not result in any further reduction in the value of the Pennston property because they are not burdensome and would not limit the likely use of the property.

Mr. McNairy's testimony at the trial was consistent with the foregoing portions of his reports in that he testified to a 25% reduction in value assuming a brownfields agreement with the land use restrictions discussed above. However, at the trial he went further and offered the opinion that if the land use restrictions also included a restriction requiring the installation of remedial devices needed to mitigate the potential of ground vapor intrusion that there would be an additional 25% reduction in value. This testimony is somewhat surprising given the fact that he was unable to offer an opinion regarding that same scenario in his earlier appraisal reports. According to his reports, Mr. McNairy could not provide an opinion regarding this issue because he was unable to determine the effect that "this scenario" would have on the Pennston Property:

> Due to the number of unknown factors involved in this scenario, such as the costs and time constraints of reporting, recording, additional monitoring and the installation of remedial devices, we do not know what the effect of the property would be and therefore, we are unable to determine the effect that

this scenario would have on the subject
property.

(Exhibit 22, p. 58).  The only explanation offered for this new
found opinion was that he had seen a copy of a May 2, 2011 letter
that the Claimant had received from DENR. (Claimant Exhibit 27).
This letter was not notification of some new or additional
contamination of the Pennston property as Mr. McNairy seemed to
believe during his testimony.  Rather, the letter addressed the
type of land use restrictions that might be included in the
Claimant's brownfields agreement.  The letter did refer to the
"likely inclusion" of a land use restriction requiring that no
structure be constructed on the property without assessment data
(i.e., testing) demonstrating to DENR's satisfaction that there is
no vapor intrusion risk or that vapor intrusion mitigation
agreeable to DENR be incorporated into the construction of such
structures.  Apparently, based solely on having seen this letter,
Mr. McNairy expressed the opinion that the value of the Pennston
property would be 50% or more.  There are several reasons why this
testimony carried little, if any, weight.  There was no showing
that Mr. McNairy had even a rudimentary understanding of the type
of land use restriction related to vapor intrusion that was under
consideration, the measures that would be required in order to
conduct the required testing or remediation or the costs associated
with doing so.  A lack of this type of information apparently is
why Mr. McNairy was unable to express an opinion in his reports.

The DENR letter supplied none of the missing information regarding the time constraints and costs that would be involved with a vapor intrusion land use restriction. Thus, Mr. McNairy was as uninformed regarding the missing information after he received the letter as he was before receiving the letter. Also, it appeared from his testimony that he was confused about the contents of the letter and mistakenly was treating it as a determination having been made by DENR that ground vapor intrusion had been established throughout the property and that remediation would be uniformly required. In actuality, the letter merely indicated that a vapor intrusion restriction might be included and made clear that such a restriction contemplated that testing would be done to determine if there was a vapor intrusion problem and would require remediation only if such testing was positive. But, perhaps more importantly, Mr. McNairy's opinion appeared to be nothing more than guesswork on his part. Mr. McNairy exhibited doubt and uncertainty several times about his 50% figure, finally stating at one point in his testimony that the opinion was a "guess on my part."

In short, the court is unpersuaded by the Claimant's evidence regarding diminution in value, particularly the percentage of diminution opined by Mr. McNairy. The appraisal reports and his testimony do not support his conclusion of a 25% diminution without a soil vapor land use restriction and 50% with such a land use restriction. His analysis of the three contaminated properties in

Guilford County was incomplete and flawed. He was unable to describe, and apparently was unaware of, the type of contamination involved at the three sites and did not know whether the purchasers of the properties had obtained brownfields agreements, which is information needed in order to make a comparison between those properties and the Pennston property. For two of the contaminated sites, no basis is apparent for why the figures used to compute the percentage diminution can be used for that purpose. In one case, a sale price was evaluated against a list price, without any support that the list price represented a price at which the property could have actually been sold but for contamination. In the other case, the appraised property was a larger tract than the final sale tract. To be relevant, the change in price would need to be apportioned between the loss of site size and the prospect of contamination, an apportionment that was not completed. The final property, where there was a 13.5% decrease from offer to sale price, is more suggestive of actual diminution of value due to contamination. Nevertheless, the report's description of the parcel demonstrates a complex project with active remediation and other activities that were ongoing at the time the sale. Based on the information presented to the court, it is not plausible to conclude that the entire 13.5% was due to contamination stigma.

Environmental contamination is clearly an unusual area for appraisals, where it is difficult to identify comparable

transactions.  Therefore, in coming to an opinion, the appraiser's knowledge and experience with respect to contamination is crucial for filling in the analytical gaps.  Here, Mr. McNairy did not demonstrate a level of such knowledge or experience that would lend credibility to his conclusions.  On the contrary, during his testimony, he exhibited an alarmist outlook towards environmental contamination, no particular knowledge of the brownfields program, and no experience in determining the true value of contaminated property.  It also appears that the witness failed to take into account that the uncertainty and risk related to the contamination of the Pennston property has been minimized.  There has been extensive testing and remediation over a period of more than twenty years regarding the contamination such that the type and extent of the contamination is well known.  The Debtor has accepted responsibility for the contamination and is proposing a remedial action plan that provides for continuation of monitoring and remediation of the contamination as to its property and the Pennston property, and has funded an escrow account that will be available to pay the cost of such monitoring and remediation.  The Pennston property has been accepted into the brownfields program and there appears to be little, if any, doubt about the Claimant being able to obtain a brownfields agreement.  Pursuant to the North Carolina Brownfields Property Reuse Act, if complied with, the brownfields agreement will protect the Claimant as well as

parties to whom the property is transferred from any environmental liability in the future. The type of land use restrictions that likely will be included in the brownfields agreement have been revealed and even if a restriction regarding vapor intrusion is included, the restrictions will not prevent or significantly limit the development of the property.

The failure of the Claimant's evidence does not mean that no damages are available based upon diminution in value. At no point has the Debtor contended that no such damages have been sustained and Debtor did not attempt to prove a total absence of such damages at the trial. The Debtor's evidence included the appraisal reports (Debtor's Exhibits 16 and 17) and the testimony of Terry D. Dalrymple, who also was proffered and accepted as an expert in real estate appraisal. Similar to Mr. McNairy, Mr. Dalrymple calculated the amount of the diminution by first determining the market value of the Pennston property in a hypothetical, uncontaminated condition and then determined the market value as contaminated, with the difference in the two values being the amount of the diminution in value. Mr. Dalrymple also used the Sales Comparison Approach in arriving at the hypothetical value of the property. Using his comparables, which were different from the comparables considered by Mr. McNairy, and his adjustments and analysis, he placed the hypothetical, uncontaminated value of the Pennston property at $1,888,000. In arriving at the value of the property

in its contaminated condition, Mr. Dalrymple also determined a percentage by which the hypothetical value should be reduced as a result of the contamination.  After examining nine transactions involving the sale of contaminated real estate in Guilford County he did a case study analysis that led him to conclude that a discount of 5% was representative of the value impact created by the contamination of the Pennston property, which yielded a diminution in value of $94,400.[8]  The testimony of Mr. Dalrymple at the hearing was consistent with these provisions of his report and certainly was not unexpected from the standpoint of the Debtor. Thus, the report and testimony of Mr. Dalrymple were offered by the Debtor with the full knowledge that his report and testimony would verify diminution in value damages of $94,400.  Under the circumstances of this proceeding, the Debtor's submission of the Dalrymple reports and testimony into evidence amounts to an admission by adoption that the Claimant has sustained diminution in value damages of $94,400 and is a sufficient basis for awarding that amount as a part of the Claimant's claim.  See Fox v. Taylor Diving & Salvage Co., 694 F.2d 1349, 1355-56 (5th Cir. 1983)

---

[8]Mr. Dalrymple also did an analysis utilizing a methodology known as the Engineering Impaired Valuation Model ("EIVM") in which allowances were included for anticipated costs in order to obtain a brownsfield agreement in addition to the 5% marketing discount. Since the court already has dealt with and awarded such expenses where appropriate, the EIVM is not an acceptable indication of the diminution in value since, if utilized, it would involve double counting expenses such as attorney fees, etc., which already have been awarded.

(holding that party adopted the testimony of his expert witness); Harris v. U.S., 834 A.2d 106, 116–19 (D.C. App. 2003) (documentary evidence submitted to court may be treated as an adopted admission).

CONCLUSION

In accordance with the foregoing findings and conclusions, the objections of the Debtor to the claims of Reedy Fork Investments, LLC and Pennston Corporation shall be sustained and such claims shall be disallowed except for the following amounts which shall be allowed as an unsecured nonpriority claim:

| | |
|---|---|
| $ 54,000.00 | - settlement of indemnity claim |
| 5,500.00 | - DENR fees |
| 7,465.40 | - Engineering fees |
| 57,748.30 | - Attorney fees already incurred |
| 7,500.00 | - Attorney fees to be incurred |
| 2,500.00 | - Implementation expenses to be incurred |
| 94,400.00 | - Damages for diminution in value |
| $229,113.70 | - Total |

An order so providing shall be entered contemporaneously with the filing of this memorandum opinion.

This 6th day of September, 2011.

William L. Stocks
WILLIAM L. STOCKS
United States Bankruptcy Judge

# PARTIES TO BE SERVE

Michael D. West
**Bankruptcy Administrator**
P.O. Box 1828
Greensboro, NC 27402

John A. Northen
P. O. Box 2208
Chapel Hill, NC 27514-2208

John H Small
Brooks Pierce McLendon
P O Box 26000
Greensboro, NC 27420-6000

George House, Esq.
P O Box 26000
Greensboro, NC 27420

Amos C Dawson C Dawson, Esq.
P O Box 1000
Raleigh, NC 27602

W. Wallace Finlator, Jr.
NC Attorney General's Office
P O Box 629
Raleigh, NC 27602